EXHIBIT A

**IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION**

UNITED STATES OF AMERICA,     *

                              *

          Plaintiff,     *

                              *

         v.       *      1:16-CV-03088-ELR

                              *      FILED UNDER SEAL

STATE OF GEORGIA,     *

                              *

          Defendant.     *

                              *

_____

**O R D E R**
_____

There are several matters in this case pending before the Court. The Court

sets forth its reasoning and conclusions below.

## I.      Background[1]

Plaintiff United States of America, through the United States Department of Justice ("DOJ"), brings this civil rights suit against Defendant State of Georgia (the "State") for alleged violations of Title II of the American with Disabilities Act, 42 U.S.C. §§ 12131–34 ("ADA" or "Title II").[2]  See Compl. [Doc. 1].  Specifically, DOJ claims that the State discriminates against thousands of public school students with behavior-related disabilities "by unnecessarily segregating them, or by placing them at serious risk of such segregation, in a separate and unequal educational program known as the Georgia Network for Educational and Therapeutic Support Program (the 'GNETS Program' or 'GNETS')."  Id. ¶ 1.  Therefore, DOJ brings two (2) claims against the State for violations of Title II based on the unjustified

---

[1] The facts herein are undisputed unless noted otherwise.  The Court uses the Parties' proposed facts and responses as follows: where one side admits a proposed fact, the Court accepts it as undisputed for purposes of this order and cites only the proposed fact.  Where one side admits a proposed fact in part, the Court includes the undisputed part.  Where one side denies a proposed fact in whole or in part, and such fact is material, the Court reviews the record and determines whether a factual dispute exists.  If the denial is without merit, either because the proposed fact has been deemed admitted or the record citation supports the proposed fact, then the Court cites only to the proposed fact and not the response.  Although the Court has endeavored to deal with all objections, given the extensive number of them, the inclusion of a proposed fact with no discussion of the objection means that it been considered, but overruled.  Finally, the Court excludes proposed facts that are immaterial, includes facts drawn from its review of the record, and considers all proposed facts in light of the standard for summary judgment.  See LR 56.1(B)(2)(a)(2)(iii), NDGa.; see also Fed. R. Civ. P. 56(c)(3); Tomasini v. Mt. Sinai Med. Ctr. of Fla., 315 F. Supp. 2d 1252, 1260 n.11 (S.D. Fla. 2004) (explaining that a district court is not obligated to "scour the record" to determine whether triable issues exist).

[2] Although Title II is just one portion of the ADA, the Court uses the terms "Title II" and "ADA" interchangeably herein for ease of reference.  See 42 U.S.C. §§ 12131–34.

segregation of these students and the unequal educational opportunities these students receive.  Id.

## A.  State System Overview

"The provision of an adequate public education for the citizens [is] a primary obligation of the State of Georgia."  GA. CONST. art. VIII, § 1, ¶ 1.  The State Board of Education (the "State Board") is the constitutional state education authority for purposes of federal laws and regulations and among its responsibilities are "defin[ing] education policy for the public K–12 education agencies in Georgia" and establishing regulations for the operation of any "special schools," which includes GNETS.  E.g., Ga. Comp. R. & Regs. § 160-4-7-.15(1)(f); GA. CONST. art. VIII, § 5, ¶ VII(a).  Georgia law requires the State Board to "adopt classification criteria for each area of special education to be served on a state-wide basis" and to "adopt the criteria used to determine eligibility of students for state funded special education programs[,]" see O.C.G.A. § 20-2-152(a), and requires the "State School Superintendent [to] carry out and enforce all the rules and regulations of the State Board[.]" Id. § 20-2-34. "[S]ubject to supervision and oversight by the State Board" and the State School Superintendent, the Georgia Department of Education ("GaDOE") is the State agency "charged with the fiscal and administrative management of certain aspects of K–12 public education, including the

implementation of federal and state mandates." Ga. Comp. R. & Regs. § 160-4-7-.15(c); [Doc. 430-1 ¶ 3].

Additionally, Georgia law vests the State's Department of Behavioral Health and Developmental Disabilities ("DBHDD") with "the primary responsibility for planning, developing, and implementing the coordinated system of care for severely emotionally disturbed children."[3]  O.C.G.A. § 49-5-220(b).  A "'[s]everely emotionally disturbed child or adolescent' or 'child or adolescent with a severe emotional disturbance' means a person defined as such by the [DBHDD] for mental health services or by [GaDOE] for educational purposes." Id. § 49-5-221(10). Georgia law charges DBHDD and the State School Superintendent, through GaDOE, with the duty to "jointly develop and implement a State Plan for the Coordinated System of Care for severely or emotionally disturbed children or adolescents." Id. § 49-5-220(c)–(d).  And the State Board "may provide such educational services with funds specifically approved by the General Assembly for this purpose by" providing grants to regional or local educational agencies ("RESAs" or "LEAs"). Id. § 20-2-152(c)(1)(A)–(B). As such, the State Board "may

---

[3] DBHDD's statutory powers and duties include "[e]stablish[ing], administer[ing], and supervis[ing] the [S]tate programs for mental health, developmental disabilities, and addictive diseases[.]" O.C.G.A. § 37-1-20(1).  Additionally, in collaboration with the Georgia Department of Community Health ("DCH"), DBHDD administers behavioral health services to some of Georgia's Medicaid recipients, including uninsured "youth with serious emotional disturbances." See Deposition of Judy Fitzgerald ("Fitzgerald Dep.") at 52:21–54:3, 217:23–218:1 [Doc. 413]; [see also Docs. 430-1 ¶¶ 13, 15; 24–26; 448-2 ¶ 27].

4

promulgate rules, regulations, and standards and establish the terms and conditions governing the provision of [S]tate aid[.]" Id. § 20-2-152(c)(2).

**B.    GNETS Overview**

The program that became known as GNETS purports to "provide[] comprehensive educational and therapeutic support services to students who exhibit intense social, emotional and/or behavioral challenges with a severity, frequency or duration such that the provision of education and related services in the general education environment has not enabled him or her to benefit educationally based on" the student's Individualized Education Plan ("IEP"), which is developed by a student's IEP team. See Ga. Comp. R. & Regs. § 160-4-7-.15(2)(a), 3(a). The State Board, pursuant to its statutory authority and through GaDOE, "promulgate[s] rules, regulations, and standards and establish[es] the terms and conditions governing the provision of [S]tate aid" for GNETS programs, specifically, through the GNETS Rule. See O.C.G.A. § 20-2-152(c)(2); see also Ga. Comp. R. & Regs. § 160-4-7-.15 (the "GNETS Rule"); [Doc. 430-1 ¶ 8]. The State requires that a student only be considered for GNETS upon the recommendation of the student's IEP team and such recommendation is "based on . . . all of the following, which [must] be documented in the student's education record:"

> 1. Documentation that indicates evidence of annual IEP reviews, progress monitoring data aligned with IEP goals, documentation indicating prior services were delivered in a lesser restrictive

environment and the student's inability to receive [a free and appropriate education, or FAPE] in that environment.

2. A Functional Behavioral Assessment (FBA) and/or Behavior Intervention Plan (BIP) administered within the past year.

3. Documentation that a comprehensive reevaluation has been completed within the last 3 years.

Ga. Comp. R. & Regs. § 160-4-7-.15(3)(c). The State's GNETS Rule enumerates the settings in which GNETS services may be provided. Id. § 160-4-7-.15(4)(c). The GNETS Rule further establishes certain reporting requirements for LEAs and RESAs (which the Court refers to interchangeably herein), requiring them to "[c]ollaborate with GaDOE to implement activities outlined in the GNETS strategic plan to improve GNETS practices and student services." Id. § 160-4-7-.15(5)(c). Additionally, the State employs two (2) staff members who ultimately report to the State School Superintendent, a GNETS Program Manager and a GNETS Program Specialist, to "oversee the State's responsibilities related to the GNETS Program." [See Docs. 395-33 ¶¶ 14, 18–19; 434-1 ¶ 33].

The first iteration of GNETS was originally located in Athens, Georgia, before the State subsequently reorganized it into a network of twenty-four (24) regional programs in 1976. [Doc. 434-1 ¶ 1]. At present, there are still twenty-four (24) regional GNETS programs that serve the State of Georgia's 181 public school districts. [Docs. 395-33 ¶¶ 4–6; 434-1 ¶ 3]. Some of these regional programs consist of standalone, self-contained GNETS facilities that are completely segregated from

6

general education schools and only attended by students in the GNETS program; other regional programs consist of separate GNETS classrooms "co-located with a general education school" but "populated exclusively by students in the GNETS Program[.]"[4]  [Doc. 434-1 ¶ 7].  As of 2022 (the latest year regarding which data was presented to the Court), there were approximately 2,925 students enrolled in GNETS.  [Doc. 395-2 ¶ 6].

## II.   Procedural History[5]

Following an extended discovery period and resolution of multiple discovery disputes by the Court, on October 31, 2023, DOJ filed its instant motion for partial summary judgment, which solely concerns whether the State "administers" the GNETS Program as a matter of law and is thus subject to Title II's integration mandate.  [Doc. 395-1 at 2].  On November 7, 2023, the State filed its pending motion for summary judgment, wherein it seeks full summary judgment in its favor on all of DOJ's claims.  [See generally Doc. 429-1].  Also on November 7, 2023, the State moved to exclude DOJ's expert witnesses, Drs. Robert Putnam and Amy

---

[4] Separately, DBHDD funds and manages the "Georgia Apex Program" (or "Apex"), which is "a partnership between community-based mental health providers and local schools and school districts that helps address the mental health needs of Georgia students."  [Docs. 395-44; 434-1 ¶ 15].  Notably, "Apex services cannot be provided in private charter schools, GNETS standalone facilities, private schools, or homeschooled/cyber public schools."  [Docs. 395-44; 434-1 ¶ 15].  As discussed further below, one of DOJ's expert witnesses recommends expanding Apex in Georgia schools as an alternative to serving students through GNETS.  See infra, part IV.A.1.

[5] The procedural history of this action is quite lengthy; thus, the Court refers to its previous Orders dated May 13, 2020, and January 15, 2021, for additional procedural history that is not set forth in this order.  [See Docs. 61, 94].

McCart.  [Docs. 428, 431].  In support of its motion to exclude Dr. Putnam, the State tendered a sworn statement by its purported witness, Mr. Dante McKay (the "McKay Declaration").  See Declaration of Dante McKay ("McKay Decl.") [Doc. 428-4]. Thereafter, on November 21, 2023, DOJ moved to strike or exclude the McKay Declaration.  [Doc. 439].  On February 2, 2024, DOJ filed a motion *in limine* to partially exclude the testimony of the State's rebuttal expert, Dr. Andrew Wiley. [Doc. 476].

The undersigned presided over a hearing on April 18, 2024, to hear oral argument from both Parties regarding the foregoing motions, all of which were fully briefed before the hearing.  [See Docs. 475, 478, 488].  Subsequent to that hearing, on July 12, 2024, the State file a "Notice of Supplemental Authority" purporting to bring a new and relevant Supreme Court decision to the Court's attention. [Doc. 492].  A week later, DOJ filed a motion for leave to file a response to the State's supplemental authority (with the proposed response attached), to which the State responded.  [Docs. 493, 493-1, 494].  Having been fully briefed, all pending matters are now ripe for the Court's review.  The Court begins with the Parties' cross-motions for summary judgment.

## III.   Cross-Motions for Summary Judgment

DOJ seeks partial summary judgment on the sole issue "that the State administers the GNETS Program within the meaning of Title II and is thus subject

to Title II's integration mandate." [Doc. 395-1 at 2] (citing 28 C.F.R. § 35.130(d) (the "Integration Mandate")). The State moves for full summary judgment in its favor based on (1) DOJ's purported lack of Article III standing to bring this case and (2) the supposed failure of DOJ's Title II claims on the merits. [Doc. 429-1 at 15–36]. The Court sets forth the relevant legal standard below.

### A.    Legal Standard

The Court may grant summary judgment only if the record shows "that there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law." See FED. R. CIV. P. 56(a). A factual dispute is genuine if there is sufficient evidence for a reasonable jury to return a verdict in favor of the non-moving party. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). A factual dispute is material if resolving the factual issue might change the suit's outcome pursuant to the governing law. See id.

When ruling on a summary judgment motion, the Court must view all the evidence in the record in the light most favorable to the non-moving party and resolve all factual disputes in the non-moving party's favor. See Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 150 (2000). The moving party need not positively disprove the opponent's case; rather, the moving party must establish the lack of evidentiary support for the non-moving party's position. See Celotex Corp. v. Catrett, 477 U.S. 317, 325 (1986).

9

If the moving party meets this initial burden, in order to survive summary judgment, the non-moving party must then present competent evidence beyond the pleadings to show that there is a genuine issue for trial.  See id. at 324–26.  The essential question is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law."  See Anderson, 477 U.S. at 251–52.  "The mere existence of a scintilla of evidence" supporting the non-movant's case is insufficient to defeat a motion for summary judgment.  See id. at 252.  There must be evidence on which a jury could reasonably find for the non-moving party.  See id.

"The standard of review for cross-motions for summary judgment does not differ from the standard applied when one party files a motion, but simply requires a determination of whether either of the parties deserves judgment as a matter of law on the facts that are not disputed."  GEBAM, Inc. v. Inv. Realty Series I, LLC, 15 F. Supp. 3d 1311, 1315–16 (N.D. Ga. 2013) (citing Am. Bankers Ins. Grp. v. United States, 408 F.3d 1328, 1331 (11th Cir. 2005)); cf. United States v. Oakley, 744 F.2d 1553, 1555 (11th Cir. 1984) ("Cross-motions for summary judgment will not, in themselves, warrant the court in granting summary judgment unless one of the parties is entitled to judgment as a matter of law on facts that are not genuinely disputed.") (internal quotation omitted).  The Court must consider each motion on its own merits, resolving all reasonable inferences against the party whose motion is

under consideration.  See U.S. ex rel. Saldivar v. Fresenius Med. Care Holdings, Inc., 972 F. Supp. 2d 1339, 1341 (N.D. Ga. 2013).  Cross-motions may, however, be probative of the absence of a factual dispute where they reflect general agreement by the parties as to the controlling legal theories and material facts.  See id. at 1341; accord Oakley, 744 F.2d at 1555–56.

**B.  Discussion**

Having set forth the relevant legal standard, the Court turns to the Parties' arguments.  The Court begins with the Article III standing dispute, next turns to the analysis of whether the State can be held liable pursuant to the Integration Mandate for the instant alleged violations of Title II, and then takes up the Parties' arguments regarding the merits of DOJ's claims.

1.   Standing

Article III of the Constitution permits federal courts to adjudicate only "actual cases and controversies."  U.S. CONST. art. III, § 2.  "To have a case or controversy, a litigant must establish that he has standing, which must exist throughout all stages of litigation."  United States v. Amodeo, 916 F.3d 967, 971 (11th Cir. 2019) (internal quotation marks and citation omitted).  Standing is a jurisdictional issue that the Court must decide before reaching the merits of a case.  Trichell v. Midland Credit Mgmt., Inc., 964 F.3d 990, 996 (11th Cir. 2020) (internal citation omitted).  "In essence[,] the question of standing is whether the litigant is entitled to have the court

decide the merits of the dispute or of particular issues." <u>Warth v. Seldin</u>, <u>422 U.S.</u> <u>490, 498</u> (1975). To establish Article III standing, the plaintiff must show "(1) an injury in fact that (2) is fairly traceable to the challenged action of the defendant and (3) is likely to be redressed by a favorable decision." <u>Jacobson v. Fla. Sec'y of State</u>, <u>974 F.3d 1236, 1245</u> (11th Cir. 2020) (citing <u>Lujan v. Defs. of Wildlife</u>, <u>504 U.S.</u> <u>555, 560</u>–61 (1992)). To survive a standing challenge at summary judgment, a plaintiff must "set forth by affidavit or other evidence specific facts . . . which for purposes of the summary judgment motion will be taken to be true." <u>Lujan</u>, <u>504</u> <u>U.S. at 561</u> (internal quotation marks omitted) (quoting F<small>ED</small>. R. C<small>IV</small>. P. 56(e)).

The State argues that DOJ lacks standing to bring the Title II claims at issue. [<u>E.g.</u>, Docs. 429-1 at 10–19; 434 at 21–35]. Specifically, the State contends that DOJ fails to satisfy any of the three (3) elements of constitutional standing because (1) DOJ purportedly cannot prove any injury-in-fact suffered by any individual student in GNETS or at serious risk of placement in GNETS and (2) the harm alleged by DOJ is neither traceable to the State nor (3) redressable by a judgment against it, because the State does not "administer" GNETS in any relevant way. [<u>E.g.</u>, <u>Doc.</u> <u>429-1 at 10</u>–17 & n.15].

In response, DOJ maintains that it possesses standing because the injury prong is satisfied by undisputed record evidence that ostensibly demonstrates concrete injuries-in-fact suffered by students who are in GNETS or at serious risk of

placement in GNETS, or, alternatively, that the injury prong is satisfied by the "injury to [the United States'] sovereignty arising from violation of its laws" such that DOJ is not required to "show that affected students have also suffered an injury in fact." [Doc. 448-1 at 4] (citing Vt. Agency of Nat'l Res. v. United States ex rel. Stevens, 529 U.S. 765, 771 (2000) and United States v. Raines, 362 U.S. 17, 27 (1960)).   DOJ also contests the States' position regarding traceability and redressability.  [See Doc. 448-1 at 7–10].  The Court examines the three (3) prongs of Article III standing in turn below.

a.   *Injury*

As an initial matter, the Court does not credit DOJ's single passing allusion to the proposition that "injury to [the United States'] sovereignty arising from violation of its laws" satisfies the injury prong of standing for purposes of this case.  [See Doc. 448-1 at 4].  DOJ does not develop this theory of injury at all beyond citing two (2) Supreme Court cases, both of which are distinguishable and of limited relevance here.  [See id.] (citing Vt. Agency of Nat'l Res., 529 U.S. at 771 and Raines, 362 U.S. at 27).  First, while DOJ cites Vermont Agency of National Resources—a False Claims Act (or *qui tam*) case—in support of its position, DOJ simultaneously criticizes the State's citation the same case for the proposition that DOJ's "standing is dependent on the standing of the individual whom [it] is representing."  [Docs. 429-1 at 12 n.14; 448-1 at 4–5 n.4].  The Court finds both Parties' reliance on

*Vermont Agency* to be misplaced.  In *Vermont Agency*, the Supreme Court stated that an "injury to [the United States'] sovereignty arising from violation of its laws . . . suffices to support a criminal lawsuit by the Government[.]"  See 529 U.S. at 771.  The Supreme's Court holding in that case was that "a private individual has standing to bring suit in federal court on behalf of the United States under the False Claims Act . . . but that the False Claims Act does not subject a State (or state agency) to liability in such actions."  Id. at 787–88.  Because this is not a criminal lawsuit and there is no question regarding here "a private individual['s]" standing since DOJ is the only Plaintiff, the Court finds that *Vermont Agency* does not support either Party's position.  Id. at 771, 787; [Docs. 429-1 at 12 n.14; 448-1 at 4–5 n.4].

Second, DOJ cites the Supreme Court's 1960 opinion in *Raines* for its "injury to sovereignty" argument.  [See Doc. 448-1 at 4].  But *Raines* is unhelpful to the analysis at hand.  The appeal in *Raines* followed a district court's dismissal of a complaint that alleged a Fifteenth Amendment claim against various state officials pursuant to the then-current voting rights statute (formerly 42 U.S.C. § 1971(c), before it became 52 U.S.C. § 10101).  See 362 U.S. at 20.  In the lower court's view, subsection (c) of that statute was "susceptible of application beyond the scope permissible under the Fifteenth Amendment," and therefore was "to be considered unconstitutional in all its applications."  See id.  The Supreme Court reversed,

finding that the statute was constitutional as applied in the current action and the lower court should not have reached beyond the claims and facts before it to find the statute unconstitutional in all its applications. Id. at 26. In this case, though, there is no challenge to the constitutionality of the statutes at issue, so Raines lends little to the discussion at hand. Id.

The Court now addresses DOJ's primary theory of injury. The Parties dispute whether DOJ must present evidence of an "individual student who suffered discrimination" to demonstrate the type of concrete injury necessary for Article III standing. [Docs. 429-1 at 11–12; 448-1 at 5 & n. 5]. According to the State, this requirement flows from the "representative nature" of the Attorney General's standing to bring claims via the DOJ "on behalf of the aggrieved person[s]" whose rights have been violated pursuant to the ADA. [Doc. 429-1 at 11] (internal citation omitted). Following the Eleventh Circuit's majority holding in United States v. Florida, 938 F.3d 1221 (11th Cir. 2019) ("Florida I"), and as reinforced by its subsequent majority opinion denying rehearing en banc in United States v. Secretary Florida Agency for Health Care Administration, 21 F.4th 730 (11th Cir. 2021) ("Florida II"), there is no question that, by enacting Title II of the ADA, Congress empowered the Attorney General, through DOJ, to sue "any public entity" (regardless of whether it receives federal funding) on behalf of individuals with disabilities who suffer discrimination "to vindicate [those individuals'] rights and to

enforce federal law."  See Florida II, 21 F.4th at 737 (interpreting 42 U.S.C.
§ 12133); see also Florida I, 938 F.3d at 1245 ("The legislative, regulatory, and
precedential background of the statutes that Congress incorporated demonstrate that
Congress intended to create a system of federal enforcement for Title II of the
ADA.").  Indeed, the "central purpose" purpose of the ADA is "to ensure that the
Federal Government 'plays a central role in enforcing the standards established'
under the ADA '*on behalf of* individuals with disabilities.'"  Florida II, 21 F.4th at
734 (emphasis in original) (quoting 42 U.S.C. § 12101(b)(3)).

DOJ disagrees with the State's proposition that the law requires
"individualized findings" about specific students to establish injury, but
nevertheless, contends its evidence sufficiently demonstrates the concrete injuries
suffered by students currently in GNETS and students at serious risk of placement
in GNETS due to lack of adequate services or supports in their current educational
placements.  [See Doc. 448-1 at 5–6 & n.5, n.6].  Neither Party presents the Court
with caselaw, binding or otherwise, that directly addresses the question of what
evidence DOJ must identify to demonstrate injury in a Title II "representative"
enforcement action in the absence of individual co-plaintiffs.  [See generally Docs.
429-1, 448-1, 470].  Nevertheless, the Court finds that even if standing requires
individualized evidence of the affected students' injuries is, DOJ sufficiently
presents evidence satisfy that standard.  The Court first addresses injury-in-fact with

respect to (1) students placed in GNETS followed by (2) students at serious risk of being placed in GNETS.

        i.     Claims on behalf of students placed in GNETS

The Court finds that DOJ provides evidence of concrete and particularized injuries suffered by students in GNETS and that those injuries are neither hypothetical nor speculative. See Lujan, 504 U.S. at 560 (requiring injury-in-fact to be both (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical); Clapper v. Amnesty Int'l USA, 568 U.S. 398, 409 (2013) (requiring that the "threatened injury must be certainly impending to constitute injury in fact, and that allegations of possible future injury are not sufficient" (internal quotation and alteration omitted)).  Pursuant to the Supreme Court's plurality opinion in Olmstead v. L.C. ex. rel. Zimring, 527 U.S. 581 (1999), "[a] failure to receive services in the most integrated setting appropriate to the needs of qualified individuals with disabilities is a legally cognizable injury." See Timothy B. v. Kinsley, No. 1:22-CV-1046, 2024 WL 1350071, at *5 (M.D.N.C. Mar. 29, 2024) (citing Olmstead, 527 U.S. at 597).  And "continued stigmatization and inferior education" are also injuries-in-fact. See Ga. Advoc. Off. v. Georgia, 447 F. Supp. 3d 1311, 1328 (N.D. Ga. 2020); accord Olmstead, 527 U.S. at 600–01 (instructing that the "unjustified institutional isolation" of individuals with disabilities both "perpetuates unwarranted assumptions that persons so isolated are incapable or

unworthy of participating in community life" and "severely diminishes [their] everyday life activities").

Here, DOJ provides evidence of several instances of concrete injuries suffered by individual students placed in GNETS. While those accounts are too many to detail in full in this order, the Court sets out a select few below. For example, DOJ attaches to its response brief a formal complaint by a parent to GaDOE regarding how her elementary school-aged son (who is diagnosed with autism spectrum disorder, or "ASD") was transferred to a standalone GNETS program, where both she and the student's grandmother observed a male staff member "restrain [the student] incorrectly" on "multiple" occasions. [Doc. 450-9 at 4]. That parent detailed how she and the grandmother both saw the same staff member "sitting [on] or kneeling over" the student who was "laying on his stomach, face down" while protesting that the staff member "was hurting him and that he was having difficulty breathing." [Id.] The parent never received any documentation as to why her son was restrained in the first place, despite her requests for the same, and the parent complained that she even tried to show the staff member "how to restrain [her son] without hurting him" to no avail. [Id.] The same parent complained that her son lost the ability to participate in any extracurricular opportunities (including computer classes, art classes, recess, physical education, music classes, or field trips) upon being placed in GNETS. [Id. at 4–5]. Even further, that parent complained of the

instructional and social time her son lost upon being placed in GNETS, as his assigned standalone GNETS program only holds class four (4) days a week for five (5) hours a day, whereas his previous general education elementary school held class five (5) days a week for six (6) hours and ten (10) minutes a day.  [Id. at 4].  In other words, when her son was placed in GNETS, he began receiving only twenty (20) hours of classroom time a week, compared to nearly thirty-one (31) hours a week previously. [Id.]

In another exhibit attached to DOJ's response brief, a parent wrote to DOJ regarding her son, who was then a nine (9)-year-old rising fourth grader with diagnoses of ASD, ADHD, oppositional defiance disorder (or "ODD"), and sensory processing disorder (or "SPD").  [See Doc. 450-5 at 3].  The parent wrote that her son was placed in a standalone K–12 GNETS school for the last quarter of his second-grade year—but only "as a temporary placement" to get "through the end of that school year to accommodate an outpatient therapy program" he was "doing outside the school system."  [Id.]  Although it was not the parent's understanding of what should happen, her son remained in the GNETS school for the entirety of his third grade year. [Id.] ("this was[ not] ever planned to be a permanent placement").  During that academic year, the student's IEP team "agreed that he [did] not require this restrictive of an environment[;]" however, the IEP team never arranged for him to actually attend a new school in the fall for his fourth grade year.  [Id. at 4] ("Yet,

19

we start school in 15 days and he is heading back there [to GNETS] again. . . . There doesn't seem to be a clear plan for transition from the [GNETS] program[.]"). Detailing her concerns about her son's GNETS placement, the parent wrote how there is no "legitimate recess" ("These kids never get to go outside[,] and even if they did[,] there is no playground equipment because the school is housed in a shuttered middle school"); there are no art, band, chorus, music classes, or extracurriculars of any kind; there is no afterschool care, which has forced her to "have [the student] bussed to a private daycare" in a different county until she can pick him up after work ("As a single working parent, this is a big issue."); and how her son is only allowed to use the restroom with "a guard" "standing at the door[,]" something he was never subjected to in other schools and a practice the parent feels is unwarranted. [Id.] ("My son is not a criminal."). The parent also wrote:

> The future, assuming he stays at [GNETS,] is grim. He doesn't have opportunities to meet typical kids at school. He doesn't have a chance to attend a school dance or compete as a mathlete, he won't ever attend his school's baseball or football games, etc. There is no normalcy for these kids, many of whom may be able to do all those "typical" things if given the opportunity. Any of them with typical siblings or who have attended typical schools[] know what they are missing. None of my son's diagnos[e]s keep him from doing those things and[] there is no reason why the quintessential school activities couldn't be attended and enjoyed. He would be a brilliant debater, he is passionate about the environment, he would love a theater class and he aspires to be a musician more than anything. All things that he will miss in [GNETS], should we never figure out how to get out of it.

[Id.]

Another email correspondence attached to DOJ's response brief comes from a program director of a Georgia-based "therapeutic foster care agency" that "serv[es] children in the foster care system who have complex needs." [Doc. 450-6 at 3]. Her email details at least three (3) incidents at GNETS schools involving students served by her agency. First, she reports that a GNETS school in DeKalb County had an eighteen (18)-year-old student with an intellectual disability "arrested and sent to jail without notifying the foster parent, DFCS case manager, or" the foster care agency, leaving his foster parent to "beg[i]n making phone calls to find out where he was" when "the young man failed to get off the [school] bus" at the end of the day. [Id. at 3–4]. Second, less than a week after being arrested and jailed, the same student "was pepper-sprayed by the school resource officer[,]" and the officer, "[w]hen interviewed by [her agency's] staff about the incident, . . . stated that the young man ran away . . . when [the officer] pulled out the [pepper] spray[,] and the officer followed [the student] in order to spray him." [Id. at 4]. Third, she reports that a different child in foster being served by her agency "is being sent to GNETS from his home school without guardian consent" and that the student did not receive "the services detailed in this IEP ([s]mall group special education for all classes) in the home school." [Id. at 2].

Other "individualized" evidence submitted by DOJ includes additional formal complaints from parents to GaDOE, a letter from a student's physician explaining

that GNETS was inappropriate because the student's disabilities had been misdiagnosed, and correspondence from a former GNETS student about his own experiences. [Docs. 450-23 at 2 (copy of a letter from a student's medical doctor "medically certify[ing]" the child "has recently been diagnosed with bipolar disease" resulting from "a known chromosomal anomaly"; indicating that previous diagnoses of oppositional defiant disorder and ADHD, among others, were misdiagnoses of the student's genetic condition; and requesting that the student be placed "back into the regular school system" because "[he] needs to be mainstreamed"); 450-25 at 2 (copy of email correspondence between a former GNETS student and a DOJ staff member wherein the former student details his experience being placed in a GNETS standalone facility that was demolished shortly after his time there due to the building's condition; expresses that students with disabilities "are not given chances or support" in school disciplinary matters compared to "students in regular

education" with the same behaviors; and states that "the restraint and seclusion" of students like himself "needs to stop")].[6]

Additionally, DOJ presents evidence from the State's GNETS Program Manager regarding a review of "the makeup of [the] clinical staff" for all twenty-four (24) GNETS programs (for the 2015–2016 school year) that was performed to "determine[] whether or not identified GNETS programs were staffed to provide therapeutic/behavioral services to students with significant Emotional/Behavioral needs[.]" [Doc. 395-129 at 3]. That review revealed that "many of the GNETS programs are operating below the expected clinical staff ratio for therapeutic services[,]" often resorting to using "non-credentialed and under[-]qualified staff" due to "budget limitations[,]" and "are therefore challenged in providing the recommended amount of therapeutic supports[.]" [Id. at 5]. And DOJ's expert witness Dr. McCart opines that GNETS fails in numerous ways to provide

---

[6] The Court overrules the State's objections to these and several other pieces of evidence as inadmissible hearsay because "evidence does not have to be authenticated or otherwise presented in an admissible form to be considered at the summary judgment stage, as long as the evidence could ultimately be presented in an admissible form." Smith v. Marcus & Millichap, Inc., 991 F.3d 1145, 1156 n.2 (11th Cir. 2021) (internal quotation omitted); accord Carrizosa v. Chiquita Brands Int'l, Inc., 47 F.4th 1278, 1304 (11th Cir. 2022) ("At summary judgment '[a] party may object that the material cited to support or dispute a fact cannot be presented in a form that would be admissible in evidence.' Nevertheless, evidence that can be reduced to an admissible form at trial should be considered at summary judgment." (quoting FED. R. CIV. P. 56(c)(2))); United States v. Stein, 881 F.3d 853, 856–57 (11th Cir. 2018) (explaining that Rule 56(c) "allows a nonmoving party to dispute a material fact through an affidavit, which must be "made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated" (quoting FED. R. CIV. P. (c)(4) and citing Celotex, 477 U.S. at 322)).

comprehensive educational and therapeutic support services. See Expert Report of Dr. Amy McCart ("McCart Rep.") at 136–53 [Doc. 432-1]. In sum, this record evidence supports that many students with disabilities currently placed in GNETS suffer concrete injuries in multiple ways, including ongoing stigmatization, inferior education, and not receiving appropriate supports and services in the most integrated setting pursuant to the mandate of Olmstead. See 527 U.S. at 597 ("[a] failure to receive services in the most integrated setting appropriate to the needs of qualified individuals with disabilities is a legally cognizable injury"); see also Ga. Advoc. Off., 447 F. Supp. 3d at 1328 ("continued stigmatization and inferior education" are also injuries-in-fact).

> ii. Claims on behalf of students at serious risk of being placed in GNETS

The Court now turns to the State's argument that DOJ lacks standing to bring Title II claims on behalf of any students at serious risk of being placed in GNETS. The State argues the "'at-risk' population" is "abstract" and "comprised of students who may (or may not) be entitled to an IEP, and whose IEP team may (or may not) refer them [to] GNETS, in a school district where the LEA may (or may not) use the funds to support services in separated settings." [Doc. 429-1 at 12–13] (citing United States v. Mississippi, 82 F.4th 387, 398 (5th Cir. 2023)). In a footnote, the State contends that DOJ fails to produce "any evidence identifying any children who are at a 'certainly impending' risk of being referred [to] GNETS" and fails to

"establish[] that mere referral [to] GNETS . . . constitutes a real, concrete injury."[7] [Id. at 13 n.15] (quoting Clapper, 568 U.S. at 409).

However, the State's argument misses the mark. As DOJ states in its response brief, "the injury-in-fact [for these students] is the denial of necessary behavioral health services resulting in a serious risk of unnecessary segregation." [Doc. 448-1 at 6 n.7]. Put differently, students are injured when they are denied "necessary behavioral health services" in non-GNETS schools.[8] [Id.]

And as the Court earlier noted, Olmstead instructs that "[a] failure to receive services in the most integrated setting appropriate to the needs of qualified individuals with disabilities is a legally cognizable injury." See Timothy B., 2024 WL 1350071, at *5 (citing Olmstead, 527 U.S. at 597). Thus, if a student is entitled to receive behavioral health services and supports in that student's current educational placement *instead* of GNETS, but does not, that student suffers a legally cognizable injury. See id.; [see also Doc. 448-1 at 6–7 n.7] (DOJ arguing that these

---

[7] Because the State only raises this argument in a footnote in its summary judgment brief, the Court is not required to consider it. See, e.g., Pinson v. JPMorgan Chase Bank, Nat'l Ass'n, 942 F.3d 1200, 1209 n.5 (11th Cir. 2019) ("We do not ordinarily consider arguments raised in passing in one footnote rather than the body of the brief."); Fitzpatrick v. Koch Foods of Ala., LLC, No. 2:19-CV-553-JTA, 2023 WL 3937421, at *14 (M.D. Ala. June 9, 2023); Doe v. Embry-Riddle Aeronautical Univ., Inc., No. 6:20-CV-1220-WWB-LRH, 2021 WL 2814905, at *2 (M.D. Fla. May 28, 2021). Nonetheless, the Court explains below why this argument is inapposite.

[8] The consequence of being denied the necessary behavioral health services in non-GNETS schools is that students are subsequently more likely to be placed in GNETS due to their untreated, disability-related behaviors, leading to unnecessary segregation and unequal educational opportunities. However, even removing out the potential of later GNETS placement, the present denial of necessary behavioral health services is, itself, the injury-in-fact suffered by these students. See Timothy B., 2024 WL 1350071, at *5 (citing Olmstead, 527 U.S. at 597).

students' injuries arise from "a *present* denial of services" by the State that "result[s] in a serious risk of unnecessary segregation" (emphasis added)). As detailed below, DOJ presents evidence from both individuals and an expert witness to show the connection between the failure to provide appropriate supports and services to students with disabilities and subsequent referral to GNETS due to problems that could have been prevented or mitigated by supports and services available in general education settings.

For example, DOJ attaches to its response brief a due process complaint submitted to GaDOE by a parent on behalf of a student who the Court refers to by his initials, R.D. [See Doc. 450-12]. At the time of the due process complaint, R.D. was an eleven (11)-year-old student who had received multiple disability diagnoses when he was in first grade, including ADHD, social anxiety disorder, and ASD. [Id. at 8]. R.D. was referred to GNETS for the first time by his IEP team in March 2017. [Id. at 11 n.6]. In October 2018, R.D.'s IEP team recommended that R.D. be allowed to exit GNETS. [Id. at 11]. In November 2018, the IEP team "noted that R.D. had mastered his IEP objectives and that remaining at [GNETS] would have an adverse effect on him." [Id.] Thus, the IEP "team exited him from the GNETS program and

decided that R.D. would transfer to an EBD[9] classroom at ███ Elementary School on December 10, 2019." [Id.] (footnote supplied). R.D. only attended ███ Elementary School for three (3) weeks due to the long bus commute necessary to transport him there; thus, R.D.'s IEP team reconvened on February 25, 2019, and "transferred R.D. again, this time to the EBD unit at ███ Elementary School[,]" where R.D. was to receive supports and services through special education. [Id. at 11, 16].

Less than a week after starting at his third school in less than a year, on March 7, 2019, R.D. experienced "severe disability-related behaviors" (such as verbal and physical aggression) outside ███ Elementary School for approximately forty-five (45) minutes. [Id. at 11]. However, R.D. was able to de-escalate and complete

---

[9] Emotional and behavioral disorder, or EBD, is a disability "characterized by" one or more of the following characteristics to such a degree that the disability "interferes significantly with educational performance" and renders the "provision of special educational service[s] . . . necessary":

    (i)     An inability to build or maintain satisfactory interpersonal relationships with peers and/or teachers. For preschool-age children, this would include other care providers.

    (ii)    An inability to learn which cannot be adequately explained by intellectual, sensory or health factors.

    (iii)   A consistent or chronic inappropriate type of behavior or feelings under normal conditions.

    (iv)   A displayed pervasive mood of unhappiness or depression.

    (v)    A displayed tendency to develop physical symptoms, pains or unreasonable fears associated with personal or school problems.

See GaDOE, Emotional and Behavioral Disorder (EBD), https://archives.gadoe.org/DMGetDocument.aspx/EMOTIONAL%20AND%20BEHAVIORAL%20DISORDER.pdf?p=6CC6799F8C1371F6B8F2A7669398C922E63F2BDC2C8B7BAE1D64B35B9DC25364&Type=D (last accessed August 7, 2024).

the day at school.  [Id.]  On March 14, 2019, the IEP team met again and "improperly reassigned [R.D.] to the GNETS . . . program" based on "concerns about [R.D.'s] 'phobia of school' and transition challenges."  [Id. at 11–12].  The IEP team made this determination without conducting any updated assessments—despite R.D.'s parent requesting such assessments because his old assessments were outdated (approximately three (3) years old) and did not include his ASD diagnosis.  [Id.]  Additionally, the March 14, 2019 decision to reassign R.D. to GNETS conflicted with his IEP team's findings during October and November 2018 that R.D. was "ready to reintegrate" into a less restrictive school setting and that remaining in GNETS "would have an adverse effect on him."  [Id. at 12].  Notably, the IEP team's March 2019 decision to re-route R.D. back to GNETS seemingly did not adhere to the eligibility criteria for placing a student in GNETS.[10]  [See id. at 10–12]; see also Ga. Comp. R. & Regs. § 160-4-7-.15(3) (setting forth the requirements for an individual student to be considered for GNETS services).

The Court pauses here to note that R.D.'s experience is analogous to the experiences of two (2) plaintiffs in Timothy B. v. Kinsley, a Title II case from the

---

[10] Due to R.D.'s "heightened anxiety associated with" the GNETS school, he did not return there after the IEP team made its recommendation to send him back in March 2019.  [Doc. 450-12 at 13].  Even though R.D. did not meet the eligibility criteria for GNETS in March 2019 and had already "completed" the objectives that precipitated his first referral to GNETS in 2017, his home school district refused to assign R.D. to a non-GNETS school for the rest of the 2019 school year or during the 2019–2020 school year.  [Id.]  As a result, it appears that R.D. lost more than a full school year's worth of instructional time.  [Id.]

United States District Court for the Middle District of North, wherein the district court held that those plaintiffs had standing. See 2024 WL 1350071, at *15. In that case, the plaintiffs were all children with disabilities in foster care who were currently or had been, in the past, institutionalized in psychiatric residential treatment facilities by North Carolina's child welfare system. Id. at *1. Two (2) of the plaintiffs were no longer institutionalized by the time the lawsuit progressed to the motion to dismiss stage, and the defendant moved to dismiss their claims on the basis that they could no longer show a concrete, non-hypothetical injury. Id. at *4, 15. The district court rejected the defendant's argument because "[a]lthough community-based placement is appropriate for [those two (2) plaintiffs], they have been unable to secure a stable, long-term placement in the community, putting them at serious risk of re-institutionalization." Id. at *15. Thus, the district court found that "unjustified institutionalization [wa]s not a 'hypothetical future event'" for those children. Id. Similarly, R.D.'s difficulty securing a "stable, long-term placement" in a general education setting demonstrates how the denial of supports and services can, and does, result in imminent risk of students with disabilities being placed (or re-placed) in GNETS. See id.; [see also Doc. 450-12 at 11].

Beyond R.D., DOJ provides multiple other examples of individual students with disabilities being denied supports and services in their current educational setting that gave rise to a serious risk of placement in GNETS for those students.

[E.g., Docs. 450-9 at 4 (a parent detailing in a formal complaint to GaDOE how she requested a speech assessment and an occupational therapy (or "OT")[11] assessment for her son during a November 2017 IEP meeting; the student never received a speech assessment, and the student did not receive an OT assessment until late February 2018; and the student was placed into GNETS just four (4) days after that OT assessment, despite the student's physician recommending supports that could have allowed the student to remain in a general education classroom); 450-10 (parent formal complaint to GaDOE detailing that her son went from being an honor roll student in second grade to failing classes in third grade; IEP strategies and requirements were then put in place, but the student's teachers failed to implement the IEP; and within two (2) years, the child was placed in GNETS, which caused the student to feel like he could never "succe[ed] in life ever" and that he "is just doing enough to keep [him]self going")].

In addition, one of DOJ's expert witnesses, Dr. Robert Putnam, examined the services billed to Medicaid and PeachCare for students who were placed in GNETS during the 2020 and 2022 school years to determine what services those students received during the five (5)-year period leading up to their referrals to GNETS.  See

---

[11] Occupational therapy (or "OT") is "therapy based on engagement in meaningful activities of daily life (such as self-care skills, education, work, or social interaction) especially to enable or encourage participation in such activities despite impairments or limitations in physical or mental functioning."  See Merriam-Webster Dictionary, Occupational Therapy, https://www.merriam-webster.com/dictionary/occupational%20therapy?utm_campaign=sd&utm_medium=serp&utm_source=jsonld (last accessed May 16, 2024).

Expert Report of Dr. Robert Putnam ("Putnam Rep.") at 42–43 [Doc. 428-1]. Dr. Putnam observed that upwards of 81% of students placed in GNETS during the 2020 and 2022 school years are or were (at some point in the years leading up to their GNETS placement) enrolled in Medicaid or PeachCare. Id. at 43 (explaining that "[t]he vast majority of students in GNETS are enrolled in Medicaid or PeachCare"). As observed earlier in this order, DBHDD and DCH collaboratively administer Medicaid-reimbursable behavioral health services to children enrolled in Medicaid/PeachCare. [Doc. 448-2 ¶ 27].

According to Dr. Putnam's review of the students placed in GNETS who had been eligible for Medicaid or PeachCare, between 26.8% and 34.4% of those students (depending on the specific school year) never received *any* Medicaid/PeachCare services prior to being placed in GNETS, "despite the fact that they are eligible for those services and that those services are designed to support children with behavioral health needs and help them avoid placement in a restrictive setting."[12] Putnam Rep. at 43. Those students who *did* receive therapeutic Medicaid/PeachCare services before being placed in GNETS often only received services "in small amounts." Id. Additionally, DBHDD, through a contract with

---

[12] As Dr. Putnam also observed, for each school year, more than fifty (50) students referred to GNETS who were eligible for Medicaid/PeachCare received only an assessment (such as "Nursing Assessments and Health, Behavioral Health Assessments, Diagnostic Assessments, and Psychological Testing") and nothing further—that is, no follow-up services or supports whatsoever. See Putnam Rep. at 43 & n.136.

Georgia State University's Center of Excellence, provides intensive services (called "IC3") that are "designed to support children with the most intensive needs and their families." Id. at 43–44. However, Dr. Putnam's assessment shows that a mere 8%–9% of students placed in GNETS during the 2020 and 2022 school years have *ever* received such intensive services from the State, and less than 4% of those students received intensive State services *prior* to their GNETS placement. Id. at 43–47. "Just 3% of the Medicaid/PeachCare-enrolled students in GNETS" during school years 2020 and 2022 received group counseling "at any time from 2017 to 2022[,]" and, on average, those students who did receive group counseling received less than four (4) hours total. Id. at 50. And around 60% of the same students received either no individual counseling or just one to two (2) individual counseling sessions "in the year leading up to their admission to GNETS[.]" Id. at 51.

As individual examples, Dr. Putnam details the Medicaid/PeachCare services received by one student who entered GNETS during school year 2020 ("Tyler," whose name has been changed to protect his identity) and one student who entered GNETS during the 2022 school year ("Kevin").[13] Id. at 52–53. First, Tyler is diagnosed with EBD and he entered GNETS in January 2020 as a seventh grader,

---

[13] Dr. Punam selected these two (2) examples after he "pulled the records of four students at random from the SY2020 cohort and three students at random from the SY2022 cohort." See Putnam Rep. at 52. He notes that "out of these seven students, at least two (one from each cohort) were enrolled in Medicaid/PeachCare and were admitted to GNETS, but received no Medicaid services at all from 2017–2022." Id. Thus, the examples discussed above are from other students who *did* receive such services.

but he "did not receive any therapeutic Medicaid services prior to his admission to GNETS" or during the remainder of the 2020 school year while he was in GNETS. Id. at 52–53.  Tyler never received any intensive IC3 services, received only three (3) individual counseling sessions during 2021, and did not receive additional services until the 2022 school year.  Id. at 53.  Dr. Putnam opines that "[h]ad Tyler received therapeutic interventions through Medicaid prior to his referral to GNETS, he might have spent his 7th and 8th grade years in a general education environment." Id.  Next, Kevin is a student diagnosed with EBD who entered GNETS during the second half of his ninth-grade year.  Id.  Despite being enrolled in Medicaid/PeachCare, Kevin did not receive any intensive IC3 services during the year leading up to his GNETS placement, and in the 180 days preceding his transfer, Kevin "received just 0.8 units of Psychiatric Treatment and 2.5 units of Individual Counseling."  Id.  Dr. Putnam opines that "[t]he minimal therapeutic services that the State provided Kevin prior to 2022 did not offer him the intensive support he needed to avoid a restrictive placement in GNETS."  Id.

Although the State may disagree with DOJ's evidence of the foregoing injuries, the Court takes DOJ's evidence as true "for purposes of the summary judgment motion."  Lujan, 504 U.S. at 561 (internal quotation marks omitted) (quoting FED. R. CIV. P. 56(e)).  Thus, the Court is unpersuaded by the State's arguments that these students' injuries are not actual, imminent, concrete, or

particularized.  [See Doc. 429-1 at 12–13].  Rather, the Court finds the injury prong of Article III standing to be satisfied for DOJ's claims on behalf of students who are at serious risk of placement in GNETS due to the lack of supports and services in their current educational settings.  See Olmstead, 527 U.S. at 597; United States v. Florida, 682 F. Supp. 3d 1172, 1185–86 (S.D. Fla. 2023) ("Florida III").

Independently, the State's reliance on the Fifth Circuit's recent decision in United States v. Mississippi does not compel this Court to reject DOJ's evidence. [See Doc. 429-1 at 12–13] (citing 82 F.4th at 398).  In that opinion, which is non-binding, the Fifth Circuit held that Olmstead and Title II only apply to "actual institutionalization" rather than the "risk of institutionalization[.]"  Mississippi, 82 F.4th at 392.  In so holding, the panel acknowledged that the majority of other courts permit "as risk" claims, but concluded that those courts apply a flawed interpretation of Title II's Integration Mandate based on DOJ guidance.  See id. at 396.  The Fifth Circuit reasoned that the Supreme Court's 2019 decision in Kisor v. Wilkie rendered it inappropriate for courts to defer to the DOJ's interpretation of its own regulation because the statutory text of Title II is not ambiguous.  See id. at 393–94, 396 & n.20 (collecting cases pre- and post-Kisor, stating that "[l]egally, nearly all of the cases rely heavily, but mistakenly, on the DOJ guidance promoting 'at risk' Title II discrimination claim" and that "Title II unambiguously covers only those 'subjected

to discrimination by any such entity,' not those who might be at risk of that discrimination"); see also Kisor v. Wilkie, 588 U.S. 558, 576 (2019).

The Fifth Circuit's analysis post-Kisor firmly remains the minority approach, and the State does not provide—nor does the Court locate—any other cases that have taken the same route. Rather, the majority of Circuits and their district courts hold, even post-Kisor, that the text of Title II of the ADA "is not limited to individuals already subject to unjustified isolation, but also extends to persons at serious risk of institutionalization or segregation."[14]  See Fitzmorris v. N.H. Dep't of Health & Hum. Servs. Comm'r Lori Weaver, No. 21-CV-25-PB, 2023 WL 8188770, at *2 (D.N.H. Nov. 27, 2023) (internal quotation marks and alteration omitted) (quoting Davis v. Shah, 821 F.3d 231, 262 (2d Cir. 2016)); see also Waskul v. Washtenaw Cnty. Cmty. Mental Health, 979 F.3d 426 (6th Cir. 2020) (finding that, even after Kisor, Title II permits at-risk claims given that "a contrary interpretation is unreasonable because the [I]ntegration [M]andate's 'protections would be meaningless if plaintiffs were required to segregate themselves by entering an institution before they could challenge an allegedly discriminatory law or policy that threatens to force them into segregated isolation'" (quoting Fisher v. Okla. Health

---

[14] For this reason, the Court need not rely on DOJ's proposed interpretation of any statute or regulation, and the State's attempted reliance on the Supreme Court's recent decision in Loper Bright Enterprises v. Raimondo is inapposite.  [See generally Doc. 492] (citing 144 S. Ct. 2244 (2024)).  Because the Court finds the State's notice of supplemental authority regarding Loper Bright does nothing to change the analysis herein, the Court denies DOJ's "Motion for Leave to File Response to Defendant's Notice of Supplemental Authority."  [Doc. 493].

Care Auth., 335 F.3d 1175, 1181 (10th Cir. 2003))); Steimel v. Wernert, 823 F.3d
902 (7th Cir. 2016); Townsend v. Quasim, 328 F.3d 511, 515, 520 (9th Cir. 2003)
(reversing summary judgment on a claim for violation of the Integration Mandate
brought by a plaintiff currently living at home who had been informed that he would
lose his benefits if he did not submit to institutionalization); Pashby v. Delia, 709
F.3d 307, 322 (4th Cir. 2013); M.R. v. Dreyfus, 697 F.3d 706 (9th Cir. 2012);
Radaszewski ex rel. Radaszewski v. Maram, 383 F.3d 599, 608, 614–15 (7th Cir.
2004) (finding that a plaintiff had stated a claim by showing that defendants' conduct
"portend[ed]" future institutionalization); Fisher, 335 F.3d at 1181–82 (holding that
Olmstead does not require a disabled person to submit to institutionalization when
"imperiled with segregation" due to a state policy); Florida III, 682 F. Supp. 3d at
1185–86 (holding, after a bench trial, that a serious risk of unnecessary segregation
created by a State program violates the ADA's Integration Mandate (citing Brantley
v. Maxwell-Jolly, 656 F. Supp. 2d 1161, 1170 (N.D. Cal. 2009); M.A.C. v. Betit,
284 F. Supp. 2d 1298, 1309 (D. Utah 2003); and Makin v. Hawaii, 144 F. Supp. 2d
1017, 1034 (D. Haw. 1999))); Timothy B., 2024 WL 1350071, at *15 (distinguishing
the facts at bar from those before the Fifth Circuit in Mississippi and holding "the
fact that some plaintiffs are not currently institutionalized will not defeat their claims
when those plaintiffs are at serious risk of re-institutionalization"); Jeremiah M. v.
Crum, No. 3:22-CV-00129-JMK, 2023 WL 6316631, at *26 & n.318 (D. Alaska

Sept. 28, 2023) (noting the Fifth Circuit's opinion in <u>Mississippi</u> but "find[ing] no reason to deviate from Ninth Circuit precedent" permitting at-risk claims); <u>Parrales v. Dudek</u>, No. 4:15CV424-RH/CAS, <u>2015 WL 13373978</u>, at *4 (N.D. Fla. Dec. 24, 2015) (denying a motion to dismiss where plaintiffs alleged they had "repeatedly been delayed or denied sufficient services to remain safely in the community" so as to "avoid institutionalization" and finding these allegations sufficient to constitute injury-in-fact); <u>Pitts v. Greenstein</u>, No. 10-635-JJB-SR, <u>2011 WL 1897552</u>, at *3 (M.D. La. May 18, 2011) ("A State's program violates the ADA's integration mandate if it creates the *risk* of segregation; neither present nor inevitable segregation is required." (emphasis in original)).  The Eleventh Circuit has not yet weighed in on this issue, although the Southern District of Florida's ruling following the bench trial in <u>Florida III</u> (which upheld the majority approach allowing at-risk claims pursuant to the ADA's Integration Mandate) is currently on appeal as of the date of this order.  <u>See</u> <u>682 F. Supp. 3d at 1185</u>–86.

Thus, absent any binding authority to the contrary, the Court finds no reason to follow the Fifth Circuit's reasoning in <u>Mississippi</u> over the majority approach (even post-<u>Kisor</u>) of "[e]very [other] court of appeals to have addressed the issue[.]" <u>See</u> <u>id.</u> at 1185.  Therefore, the Court rejects the State's argument that DOJ cannot sustain its claims on behalf of students at serious risk of placement in GNETS on this basis.  Instead, the Court finds that DOJ provides evidence of concrete and

particularized injuries suffered by students who are denied appropriate supports and services in their non-GNETS schools, thus placing them at serious risk of placement in GNETS, and that those injuries are neither hypothetical nor speculative.[15]  See Lujan, 504 U.S. at 560; Clapper, 568 U.S. 398, 409 (2013)

### b.      Traceability and redressability

Having determined that DOJ satisfies the first prong of Article III standing, the Court examines the Parties' positions regarding the second and third prongs: traceability and redressability.  [See Docs. 429-1 at 13–18; 448-1 at 7–11; 470 at 5–7].  Because these two (2) prongs are inextricably intertwined with DOJ's assertion in its motion for partial for summary judgment that the State "administers" the GNETS program (and by extension, is subject to Title II's Integration Mandate), the

---

[15] In reaching this conclusion, the Court finds the matter at bar to be factually distinguishable from Trichell, which both Parties cite in their briefs.  [See Docs. 429-1 at 12; 448-1 at 5 n.6; 470 at 4] (each citing Trichell, 964 F.3d at 996).  In Trichell, the plaintiffs received potentially misleading letters from debt collectors that the plaintiff claimed "created a risk that unsophisticated consumers might be misled into making unnecessary or even harmful payments on time-barred debt."  See 964 F.3d at 1000.  The Eleventh Circuit found that this assertion was insufficient to establish a concrete injury in fact for purposes of standing because (1) the plaintiffs did not "allege that the collection letters posed any risk of harm to themselves" and (2) "any risk that the letters may have posed to them had dissipated by the time they filed suit."  See id.  But the type of hypothetical injury created by receiving a potentially misleading letter from a debt collector is a far cry from the standard set forth by the plurality in Olmstead, which establishes that "[a] failure to receive services in the most integrated setting appropriate to the needs of qualified individuals with disabilities is a legally cognizable injury."  See Timothy B., 2024 WL 1350071, at *5 (citing Olmstead, 527 U.S. at 597).  Here, as discussed above, students were denied appropriate supports, which is an injury in itself, but also placed them at risk of unnecessary segregation and unequal educational opportunities.

Court deems it appropriate to consider the Parties' arguments on these issues together.  [See Docs. 395-1 at 22–35; 434 at 22–35; 442 at 2–18].

At present, the State first contends that Eleventh Circuit precedent holds that any injury is neither traceable to it nor redressable by a potential judgment against it because the challenged actions are attributable only to third parties, specifically, the LEAs. [Doc. 429-1 at 13].  Second, the State argues that the Court should disregard the language in the Integration Mandate to the extent that it imposes liability on public entities that fail to "administer" services to qualified individuals with disabilities in the most integrated appropriate settings (the "statutory argument").[16] [Doc. 434 at 24–30] (citing 28 C.F.R. § 35.130(d)).  Third, the State denies that it "administers" GNETS pursuant to the four (4) factors the Court has employed in previous Orders when assessing traceability and redressability.  [See Doc. 434 at 30–35].  The Court takes these arguments in turn.

### i.    Eleventh Circuit precedent

The Court finds the State's reliance on previous Eleventh Circuit precedent, to wit, the decisions in Jacobson and Lewis, to be inapposite from the facts at bar as

---

[16] The Court notes that this new, alternative proposition is directly contrary to the State's argument in an earlier stage of this litigation, when it contended that the Court should construe the term "administers" according to its plain meaning: to "be responsible for the running of" the GNETS program by providing "practical management and direction."  [See Doc. 47-1 at 10–11] (citing the Oxford Dictionary of English and Black's Law Dictionary).

they pertain to traceability and redressability.[17]  [See Doc. 429-1 at 13–14] (citing Jacobson, 974 F.3d at 1253–54, and Lewis, 944 F.3d at 1301).  As the Eleventh Circuit explained in Jacobson, the plaintiffs' claim concerning the order in which candidates appeared on election ballots was neither traceable to nor redressable by a judgment against the Florida Secretary of State, despite the Secretary's "general supervision and administration of [Florida's] election laws," because Florida law expressly delegated "control over the order in which candidates appear on the ballot" to "a different, independent official[.]"  See Jacobson, 974 F.3d at 1254 (further noting the lack of any evidence that the Florida Secretary of State controlled "ballot order").  The Eleventh Circuit observed that it confronted a similar issue (*en banc*) in Lewis:

> In Lewis, two workers sued the Attorney General of Alabama to challenge a state law that preempted a local ordinance requiring employers to pay higher wages.  [See 944 F.3d] at 1293–94.  We explained that the workers' injury—receiving lower wages because of the state law—was not traceable to the Attorney General because he had never enforced or threatened to enforce the law, *and the law itself contemplated no role for the Attorney General*.  Id. at 1296, 1298–99.  And of particular relevance to this appeal, we rejected the workers'

---

[17] Indeed, the argument the State attempts to advance through Jacobson is virtually identical to the argument the Court already addressed and rejected in the January 15, 2021 Order denying the State's motion for judgment on the pleadings.  [See Doc. 94 at 11–12].  In that Order, the Court explained that "Jacobson simply reinforces the long-established principle that any injuries alleged by a plaintiff must be traceable to the defendant, and therefore, redressable by a Court decision against the defendant."  [Id. at 12] (citing 974 F.3d at 1255).  The undersigned therein found that this case is factually distinguishable from Jacobson because, at the pleadings stage, DOJ "sufficiently allege[d] the State bears some responsibility for operating and administering the GNETS Program in a discriminatory manner[,]" and therefore, "any decision by the Court addressing these acts would be redressable by a judgment against the State."  [Id.]

> reliance upon "a host of provisions of the Alabama Code that generally
> describe the Attorney General's [enforcement] authority" to establish
> traceability.  Id. at 1300.

Jacobson, 974 F.3d at 1254 (emphasis added).  As previously discussed in the Court's January 15, 2021 Order, the facts at bar are plainly distinguishable from those the Eleventh Circuit considered in Jacobson and Lewis as they pertain to traceability and redressability.  See id.; see also Lewis, 944 F.3d at 1293–99; [Doc. 94 at 11–13].  Here, Georgia law clearly contemplates the State's role in administering services for students with disabilities, including the GNETS program.  E.g., GA. CONST. art. VIII, § 5, ¶ VII(a); O.C.G.A. §§ 20-2-152(a), 49-5-220(a)(6); Ga. Comp. R. & Regs. § 160-4-7-.15(5)(a).

## ii.    Statutory argument

42 U.S.C. § 12131(2), the statute that the Integration Mandate implements, only mentions public entities that "provide" services—which, according to the State, are the public entities that "are actually responsible for providing a discriminatory service"—but not public entities that "administer" services (as the Integration Mandate does).[18]   [See Doc. 434 at 26]; compare 42 U.S.C. § 12131(2), with 28 C.F.R. § 35.130(d).  Because the statute does not contain the word "administer" like the Integration Mandate, the State contends that "ADA liability only attaches to the

---

[18] In this respect, the State argues that 28 C.F.R. § 35.130(d) is void to the extent it might "render a state liable for something other than providing services."  [Doc. 434 at 23–24].

entity which is 'providing' the services" because "a regulation may not create liability where a statute does not." [See Doc. 434 at 23–24].  As it has throughout this litigation, the State maintains that only LEAs can be held liable for any discrimination against students with disabilities because only LEAs "provide" GNETS services.  [Id. at 29–30].

As DOJ correctly points out, the State does not cite to a single case in the ADA or Title II context to support that the term "administer"—as used in the Integration Mandate—is invalid because that term does not appear in the underlying statute.  [See Doc. 442 at 3].  And DOJ also accurately notes that "[t]he State's assertion that ADA liability attaches only to the entity directly providing the relevant services[] . . . is inconsistent with the well-established principle that a state can be held liable under the ADA even when it has contracted out provision of the challenged services."  [Id. at 4] (citations omitted).  Indeed, it is widely recognized and long held by courts across the country that "States cannot avoid Olmstead liability by contracting away their duty to provide services.  In other words, States may not discriminate indirectly more than they may do so directly."  See Florida III, 682 F. Supp. 3d at 1185 (internal citations omitted); see also 28 C.F.R. § 35.130(b)(1), (3) (instructing that public entities may not discriminate "directly or through contractual . . . or other arrangements"); M.G. v. N.Y. State Off. of Mental Health, 572 F. Supp. 3d 1, 12–13 (S.D.N.Y. 2021) (finding that formerly

incarcerated individuals with mental disabilities sufficiently alleged standing to pursue an ADA claim when they alleged that the defendants administer, oversee, and fund the state's mental health systems in a manner that resulted in unnecessary institutionalization); Murphy by Murphy v. Minn. Dep't of Hum. Servs., 260 F. Supp. 3d 1084, 1102 (D. Minn. 2017) (finding specific allegations relating to defendants' role in overseeing the administration of disability services throughout the state established causation necessary for standing); Day v. Dist. of Columbia, 894 F. Supp. 2d 1, 22 (D.D.C. 2012) (finding that "to allege the necessary 'causal connection' between the District's actions and plaintiffs' injury," the plaintiffs need not allege the District placed them in the facility); Conn. Off. of Prot. & Advocacy for Persons with Disabilities v. Connecticut, 706 F. Supp. 2d 266, 276–77 (D. Conn. 2010) (emphasis added) ("Following the logic of the defendants' argument, if Connecticut could structure a mental health system that ensured its consumers resided in privately-run facilities, it could avoid its legal obligations in this area altogether. But Olmstead made clear that the actions of the state that *led* to a denial of integrated settings could serve as the basis for an ADA claim. . . . It is the defendants' conduct in the administration of state programs that makes them proper parties here."); Disability Advocates, Inc. v. Paterson, 598 F. Supp. 2d 289, 316–19 (E.D.N.Y. 2009) (finding a state's planning, funding, and administration of service system sufficient to confer liability where state services were provided through

43

private entities); Joseph S. v. Hogan, 561 F. Supp. 2d 280, 293 (E.D.N.Y. 2008) (rejecting a state's argument that it was not "responsible for plaintiffs having been placed in nursing home facilities" where plaintiffs alleged they were entitled to receive services in a less restrictive environment because "Olmstead made clear that under Title II of the ADA, *States* are required to provide community-based treatment for persons with mental disabilities when appropriate" (emphasis in original and cleaned up)); Price v. Shibinette, No. 21-cv-25, 2021 WL 5397864, at *9–10 (D.N.H. Nov. 18, 2021) (explaining that states cannot avoid liability under the ADA's Integration Mandate by "contracting out to private entities their obligation to provide services in compliance with the ADA"); Parrales v. Dudek, No. 4:15CV424-RH/CAS, 2015 WL 13373978, at *4 (N.D. Fla. Dec. 24, 2015) (rejecting the state's traceability argument that any failings in delivery of services were the fault of managed care organizations, because the state was ultimately responsible for administering the program, and harms that flow indirectly from state action can establish traceability).

Therefore, the Court rejects the State's argument that it cannot be held liable pursuant to the ADA's Integration Mandate merely because it is not the entity directly "providing" the therapeutic and educational services in question. [See Doc. 434 at 24–30]; see also 28 C.F.R. § 35.130(b)(1), (3). The same analysis reveals the flaws in the State's argument that any challenged discrimination is not traceable to

it or redressable by a judgment against it without the presence of certain "absent third part[ies]"—that is, the LEAs—and the Court rejects this argument, as well. [Doc. 429-1 at 13] (citing Lewis v. Governor of Ala., 944 F.3d 1287, 1301 (11th Cir. 2019)).

### iii. Four (4)-factor analysis of "administers"

As this Court previously explained,

> [t]o define the term "administers," the Court first looks to the definition the legislature assigned to the term "public entity" in context with "services, programs and activities" referenced in the applicable Title II regulation. See 28 C.F.R. § 35.130(d). The ADA defines "public entity" as any "State or local government" and any department, agency, or other instrumentality of a State or local government, and covers all services, programs, and activities provided or made available by public entities, including though contractual, licensing, or other arrangements. See 42 U.S.C. §§ 12131(1), 12132; 28 C.F.R. § 35.130. Accordingly, it is apparent that Title II's coverage is intended to, and can, extend to the State in the implementation of the GNETS program[,] if the State, and not a local entity, is the actor that *administers* GNETS within the meaning of the Act. See 28 C.F.R. § 35.130(d).

[Doc. 61 at 9] (emphasis added). In its Orders dated May 13, 2020 (denying the State's motion to dismiss), and January 15, 2021 (denying the State's motion for judgment on the pleadings), the Court analyzed four (4) factors to assess whether the State "administers" the GNETS program: the extent to which the State (1) establishes criteria for the implementation of the GNETS program, (2) disburses funds to support the GNETS program, (3) promulgates regulations to carry out the

GNETS program, and (4) oversees the operations and implementation of the GNETS program throughout Georgia.[19]  [See Docs. 61 at 8–9; 94 at 8–13].

The State claims that "even if the Court use[s] the same four-factor test it employed" in previous Orders, "[t]he evidence at summary judgment does not show that the State 'administers' the GNETS Program[.]"  [Doc. 434 at 30].  Conversely, DOJ maintains that undisputed evidence satisfies each of those four (4) factors as a matter of law and that the traceability and redressability prongs of Article III standing are also met.  [See, e.g., Doc. 395-1 at 25–34].  The Court examines these four (4) factors in turn.

First, the Court considers the evidence regarding the degree to which the State establishes criteria for the implementation of GNETS.  As the Court explained in its May 13, 2020 Order:

> While the Georgia Constitution and the Georgia Code provide that counties and local school boards have the sole power to "establish and maintain public schools within their limits," GA. CONST. art. VIII, § 5, para. I, the same Constitution and Code confirm one exception to this general principle: the State's operation of "special schools."  See id. para. VII(a) ("Any special schools shall be operated in conformity with

---

[19] The State contends that the "first and third factors are simply irrelevant to this case" because (as to the first factor) DOJ "challenged neither the GNETS Rule itself nor the GNETS Rule's criteria for admission into GNETS" and (as to the third factor) the State's GNETS Rule "imposes the obligation for administering the GNETS Program (whatever that means) on the LEAs and [RESAs]."  [Doc. 434 at 30–31] (citing Ga. Comp. R. & Regs. § 160-4-7-.15(5)(a)).  The State provides no authority for why the Court should alter its analysis based on these aimless assertions other than vaguely hypothesizing that "if the Court were to adopt DOJ's theory, then it would be implicitly finding that [the U.S. Department of Education] is also liable for violating federal anti-discrimination laws like the Rehabilitation Act of 1973[.]"  [Id. at 32–33].  The Court declines to further address these irrelevant contentions because they have no bearing on the issues at hand.

regulations of the State Board of Education pursuant to provisions of law."); see also Gwinnett Cnty Sch. Dist. v. Cox, 710 S.E.2d 773, 776 (Ga. 2011) (where the Georgia Supreme Court distinguishes general education schools with "special schools" for children with [disabilities]).

The Georgia Code sets forth the State's additional obligations to children with disabilities, including that the State must adopt "classification criteria for each area of special education to be served on a state-wide basis" and "the criteria used to determine eligibility of students for state funded special education programs." [O.C.G.A.] § 20-2-152(a). The State, through [GaDOE] and the [DBHDD], is also responsible for coordinating services for children and adolescents experiencing "severe emotional disturbance," like [students] in GNETS. [O.C.G.A.] § 49-5-220(a)(6).

[Doc. 61 at 9–10]. The above-quoted excerpts from the State constitution and code demonstrate clearly how the State, through GaDOE and DBHDD, is responsible for setting the criteria for GNETS operations and eligibility. The operation of these "special schools" meant to coordinate services for students with "severe emotional disturbance[s]" is clearly within the purview of the State, through its agencies. GA. CONST. art. VIII, § 5, para. VII(a); O.C.G.A. §§ 20-2-152(a), 49-5-220(a)(6). Indeed, the State, through its statutes, expressly acknowledges "the fact that services to these children are provided by several different agencies, each having a different philosophy, a different mandate, and a different source of funding," and provides that the Georgia General Assembly "recognizes that to enable severely emotionally disturbed children to develop appropriate behaviors and demonstrate academic and vocational skills, it is necessary that the [GaDOE] provide appropriate education

. . . and that the [DBHDD] provide mental health treatment." <u>O.C.G.A. § 49-5-220(b)</u>.

It logically follows, therefore, that the State Board promulgates the GNETS Rule, which sets forth the criteria for implementing a GNETS program. [<u>See</u> <u>Doc. 434-1</u> ¶¶ 16–17]; <u>see also generally</u> <u>Ga. Comp. R. & Regs. § 160-4-7-.15</u>. The GNETS Rule requires that "[c]onsideration for GNETS services [be] determined by the student's [IEP] team using the criteria set forth in [GaDOE] Rule 160-4-7-.06." <u>See</u> <u>Ga. Comp. R. & Regs. § 160-4-7-.15</u> (citing <u>id.</u> § 160-4-7-.06). Even further, the GNETS Rule imposes a duty on each GNETS program in the State to "[c]ollaborate with GaDOE to implement" *the State's* "GNETS strategic plan" and to complete annual assessments "embedded in the GNETS strategic plan." <u>See</u> <u>id.</u> § 160-4-7-.15(5)(c)(2)–(3). These duties stand separate from the requirement in the GNETS Rule that GNETS programs must also "[c]ollaborate with LEAs to ensure that special education related services are provided to all students receiving GNETS services." <u>See</u> <u>id.</u> § 160-4-7-.15(5)(c)(1). For these reasons, it is self-evident that the State establishes criteria for the implementation of the GNETS program, and the State does not seriously contest this fact. [<u>See</u> <u>Doc. 434 at 30</u>–31] (merely stating that the GNETS Rule also imposes duties on LEAs and calling this first factor "simply irrelevant to this case"). Thus, the Court finds that the first factor supports

48

that the State administers the GNETS program within the meaning of Title II as a matter of law.

Second, it is undisputed that the State, through the State Education Agency, disburses funds to support the GNETS program through a voluntary grant application process.  [See Doc. 434-1 ¶¶ 28, 122–24].  Thus, the Court finds that the second factor supports that the State administers the GNETS program within the meaning of Title II as a matter of law.

Third, the Court finds that the State promulgates regulations to carry out the GNETS program in several different ways.  Of course, the GNETS Rule is a prime example of this.  See Ga. Comp. R. & Regs. § 160-4-7-.15.  As another example, LEAs may only deliver GNETS services in the range of settings provided in the State's GNETS Rule.  See id. § 160-4-7-.15(4).  Additionally, regional GNETS programs must submit their program budgets to GaDOE for approval.  [Doc. 434-1 ¶ 127].  The State establishes the Strategic Plan for GNETS as well as the self-assessment and review process for participating programs and mandates that LEAs follow certain data-reporting requirements about their GNETS programs and students in order to receive grant funding from the State.  See Ga. Comp. R. & Regs. § 160-4-7-.15(5)(b)–(c).  Thus, the Court finds that the third factor supports that the State administers the GNETS program within the meaning of Title II as a matter of law.

49

Fourth, record evidence supports that the State oversees the operations and implementation of the GNETS program throughout Georgia. The State employs two (2) full-time staff members, a GNETS Program Manager and a GNETS Program Specialist, who "oversee the State's responsibilities related to the GNETS Program." [Docs. 395-33 ¶¶ 14, 18–19; 434-1 ¶ 33]. The State allows GNETS services to be administered in certain settings and locations. Ga. Comp. R. & Regs. § 160-4-7-.15(4)(c). Not only does the State require, through the GNETS Rule, the specific criteria, documentation, and assessments that an IEP team must consider before recommending GNETS services for a student, but the Rule also requires that "IEP teams considering recommendation of GNETS services . . . [w]ill include a GNETS director or his/her designee." See id. § 160-4-7-.15(3). As another example of the State's administrative power over GNETS, in 2016, the State engaged an architectural firm to conduct a Facility Conditions Assessment ("FCA") of standalone GNETS buildings. [Docs. 395-33 at 47–51; 395-135 at 3]. During the summer of 2016, GaDOE shared the results of the FCA with members of the State Board. [Doc. 395-33 at 52]. The FCA scored the GNETS facilities using a number rubric where the "highest possible score" would be a score of one (1) and lower scores were between zero (0) and one (1). [Doc. 395-33 at 47–52]. Even though the FCA did not test for asbestos, lead paint, or lead in the water, it revealed nine (9) GNETS facilities with scores below 0.4. [Id. at 52–53]. As a result of the FCA,

then-Chairman of the State Board, Mr. Mike Royal, issued letters "to the Directors of the regional GNETS programs affiliated with the nine facilities and/or the Superintendents of the LEAs owning the physical facilities" informing them of the facilities "where children cannot continue to be served" and instructing that "students receiving services at this facility *must* immediately be transitioned out of [those] site[s] before the beginning of the school year" due to "unsafe and unhealthful conditions[.]" [See, e.g., Docs. 395-33 at 53–54; 395-135 at 3 (emphasis added)].

The State Board, through Chairman Royal's letters, suggested that the local agencies work with "key stakeholders," including the State GNETS director, to transition all students out of the unsafe facilities; provided the contact information of the State's GNETS Program Manager; and stated "[w]e are directing staff to assist you and provide guidance throughout this process[.]" [Doc. 395-135 at 3]. Additionally, the letter cited the Georgia statute that vests the State Board with the authority to inspect "any public school building" for "unsafe or unhealthful conditions." [Id. at 3 n.1] (citing O.C.G.A. § 20-2-16(c)). "GaDOE offered the fiscal agents of the affiliated regional GNETS programs the option" to either (1) "submit[] a proposal and timeline setting forth a plan to relocate the students" from the unsafe facilities to new sites, after which "the new site was required to be approved by GaDOE"; or (2) "apply[] for a State grant to help fund the necessary

repairs or upgrades to the" unsafe facilities and submit a written agreement to GaDOE "that the regional GNETS program would agree to occupy the facility being repaired or upgraded for no less than 10 years, absent prior approval from GaDOE[.]"  [Id. at 56–59].  This evidence supports that the decisions regarding where (or in what settings) GNETS programs operate—down to the specific facilities—are not made solely at the local level, but instead, are controlled to some degree by the State.[20]  [See Docs. 395-33 at 47–59; 395-135 at 3].

Thus, for all the foregoing reasons, the Court finds that the fourth factor supports that the State administers the GNETS program within the meaning of Title II as a matter of law.  Further, all of the above factors demonstrate why the injuries at issue in this case are traceable to the State and redressable by a judgment against it.  Accordingly, the Court (1) finds that the State is subject to the Integration Mandate and grants DOJ's motion for partial summary judgment and (2) denies the State's motion for summary judgment on the issue of standing.  [Docs. 395, 429].

### 2.    Merits of DOJ's Title II claims

In its motion for summary judgment, the State argues that DOJ cannot support either theory of Title II disability discrimination it advances in this case, whether

---

[20] The State misses the mark entirely in its response brief, where it argues that "the GNETS Rule does not empower the State to decide" where GNETS services are provided because "GaDOE lacks authority to punish LEAs and RESAs for using GNETS [g]rants for separate facilities" instead of other options, such as providing GNETS services in a fully integrated general education setting.  [Doc. 434 at 14–15, 22] (citing Ga. Comp. R. & Regs. § 160-4-7-.15(4)(c)).

based on unjustified segregation or unequal educational opportunities. [Doc. 429-1 at 19]. DOJ responds that both claims are adequately supported by evidence but does not move for summary judgment in its own favor on the merits. [Doc. 448-1 at 10–34]. The Court addresses the Parties' arguments regarding each claim in turn.

### a. Unjustified segregation

To prevail on a Title II discrimination claim, a plaintiff must demonstrate:

> (1) that he is a qualified individual with a disability; (2) that he was either excluded from participation in or denied the benefits of a public entity's services, programs, or activities, or was otherwise discriminated against by the public entity; and (3) that the exclusion, denial of benefit, or discrimination was by reason of the plaintiff's disability.

J.S., III by & through J.S. Jr. v. Hous. Cnty. Bd. of Educ., 877 F.3d 979, 985 (11th Cir. 2017) (quoting Bircoll v. Mia.-Dade Cnty., 480 F.3d 1072, 1083 (11th Cir. 2007)); 42 U.S.C. § 12132. And pursuant to the ADA's Integration Mandate, a public entity—such as the State—"shall administer services, programs, and activities in the most integrated setting appropriate to the needs of qualified individuals with disabilities."[21] 28 C.F.R. § 35.130(d).

In Olmstead, the Supreme Court held that "unjustified institutional isolation of persons with disabilities is a form of discrimination based on disability under Title

---

[21] There is no dispute in the instant case that the students enrolled in GNETS (or at substantial risk of being placed in GNETS) are "qualified individuals" pursuant to the ADA, presumably at least in part because all of these students have IEPs.

II." J.S., III, 877 F.3d at 986 (citing Olmstead, 527 U.S. at 599–600).  Although

Olmstead involved plaintiffs who were isolated in residential institutions, the

Supreme Court's reasoning in that case also applies to a student's removal from a

general education setting on the basis of disability.  See id. at 986–87 (finding that,

where a student with a disability showed that he was "excluded and isolated from

his classroom and peers on the basis of his disability," the reasoning of Olmstead

applied, even though "[i]solation via institutionalization is admittedly a more

extreme and restrictive action than removal from a school classroom").

Of course, not all isolation or institutionalization is "unjustified" because

"nothing in the ADA or its implementing regulations condones termination of

institutional settings for persons unable to handle or benefit from community

settings[,]" "[n]or is there any federal requirement that community-based treatment

be imposed on [persons] who do not desire it."  See Olmstead, 527 U.S. at 601–02

(citing 42 U.S.C. § 12132 and 28 C.F.R. § 35.130(e)(1)).  Thus, the Supreme Court

set forth the following framework to determine when isolation or institutionalization

is "unjustified":

> under Title II of the ADA, States are required to provide community-
> based treatment for persons with mental disabilities when the State's
> treatment professionals determine that such placement is appropriate,
> the affected persons do not oppose such treatment, and the placement
> can be reasonably accommodated, taking into account the resources
> available to the State and the needs of others with mental disabilities.

<u>Olmstead</u>, <u>527 U.S. at 607</u>. Therefore, to obtain summary judgment in its favor, the State must demonstrate the lack of evidentiary support for DOJ's position that the State fails to accommodate the subject students with disabilities pursuant to the above three (3) factors: (1) appropriateness, (2) non-opposition, and (3) reasonableness of proposed accommodations. See <u>id.</u>; <u>see also</u> <u>Celotex Corp.</u>, <u>477 U.S. at 325</u> (instructing that the moving party must establish the lack of evidentiary support for the non-moving party's position); <u>United Spinal Ass'n v. Bd. of Elections in City of New York</u>, <u>882 F. Supp. 2d 615, 626</u> (S.D.N.Y. 2012) ("Accordingly, summary judgment would be inappropriate at this stage if there were a genuine dispute of material fact as to whether [d]efendants accommodate voters with vision and mobility-related impairments."), <u>aff'd sub nom.</u> <u>Disabled in Action v. Bd. of Elections in City of New York</u>, <u>752 F.3d 189</u> (<u>2d Cir. 2014</u>). The Court examines these factors in turn below.

i.     Appropriateness

Pursuant to the Supreme Court's analysis in <u>Olmstead</u>, "community placement is considered 'appropriate' for individuals if they could live in the community with sufficient services for which they would be eligible." See <u>Florida III</u>, <u>682 F. Supp. 3d at 1221</u> (citing <u>Olmstead</u>, <u>527 U.S. at 602</u>); <u>see also</u> <u>42 U.S.C. § 12131(2)</u>. Adapting that reasoning for the case at bar, community placement in a general education setting (rather than GNETS) is "appropriate" for students if those

students could be educated in a general education setting with the help of supports and services for which they are eligible. See Florida III, 682 F. Supp. 3d at 1221.

The State argues that appropriateness can only be determined by a "responsible, treating physician" and that DOJ fails to proffer any evidence that a treating physician "has observed and decided that any individual—much less the unidentified 'vast majority' of—student(s) currently served in GNETS . . . could be 'appropriately' served in [a] general education classroom." [Doc. 429-1 at 20] (internal citations omitted). The State gleans this argument from Olmstead, wherein the Supreme Court held that the "State's treatment professionals" must be the ones to determine that community-based treatment and placement are appropriate before patients who are institutionalized in a State-run psychiatric hospital can be discharged and treated in the community. See Olmstead, 527 U.S. at 607; [see also Doc. 429-1 at 20–21 & n.30]. In his opinion concurring in part with the Olmstead plurality, Justice Kennedy wrote that "[t]he opinion of a responsible treating physician in determining the appropriate conditions for treatment ought to be given the greatest of deference" to avoid "driv[ing] those in need of medical care and treatment out of appropriate care and into settings with too little assistance and supervision." Olmstead, 527 U.S. at 610 (Kennedy, J., concurring).

The State's reliance on this language from the plurality opinion and Justice Kennedy's limited concurrence in Olmstead fails to reach the context presented here.

[E.g., Doc. 61 at 14–16].  As the State concedes in its own motion for summary judgment, an IEP team—not necessarily a physician, much less a State's physician—is the decisionmaker regarding what educational placement is appropriate for a student, a reality that is also reflected in the GNETS Rule.  [See Doc. 429-1 at 22]; see also Ga. Comp. R. & Regs. § 160-4-7-.15(2)(f), (3)(a).  Thus, the Court is unmoved by the State's argument that a "responsible, treating physician" must determine appropriateness.

Independently, the Parties dispute whether the United States must provide individualized evidence regarding each student's needs to satisfy the "appropriateness" prong.  [See Docs. 429-1 at 22–23; 448-1 at 14–16].  According to the State, the requirement for individualized evidence flows from the Fifth Circuit's reading of Olmstead in Mississippi:

> The state is . . . correct in contending that Olmstead cannot support a mandate for court-superintended institution-wide changes based on the "risk of institutionalization" from a survey "generalizing" from about 150 mentally ill individuals to a group of nearly 4,000.  Although "generalizations" drawn from a patient survey may be relevant to a state in assessing its own programs, they do not suffice to prove that individuals suffered "unjustified isolation" en masse.
>
> . . . .
>
> "Appropriate" treatment of those with serious mental illness, as Olmstead clearly understood, must be individualized.

See 82 F.4th at 395–96.  Additionally, the Fifth Circuit noted in Mississippi that although the United States offered a "study includ[ing] twenty-eight individuals in

state hospitals," there was no "individualized proof of 'unjustified isolation' offered." Id. at 396 n.16.  However, as the Court earlier noted, the Fifth Circuit's outlier opinion in Mississippi remains firmly the minority approach and is not binding on this Court.  See supra, part III.B.1.a.ii.

The State also relies on the Southern District of Florida's order in Florida III, which states:

> [The court] conclude[s] that the evidence established that all of the Institutionalized Children, despite their challenges, are indeed capable of community living.  Dr. Foster and the two other United States experts, working as a team, set out to answer the question of whether the children currently residing in pediatric nursing facilities in Florida would be appropriate to receive those services in a home or community-based setting.  To answer this question, she and the other experts conducted an individualized review of the medical records of all 139 Institutionalized Children.  They also toured all three pediatric nursing facilities in Florida to assess the care the children were receiving.

See 682 F. Supp. 3d at 1223–24.  The district court in Florida III went on to consider the United States' experts' opinions based not only on their "individualized review of the medical records of all 139" affected children, but also their reviews of Florida's policies and Medicaid program, their observations from their tours of the residential facilities where the children were kept, and *the court's own site visit* to one of these residential facilities.  See id. at 1224–27.  Although the district court's order in Florida III is only persuasive and not binding on this Court, the analysis therein intimates that evidence other than an "individualized review" of each

58

affected child's files can support a final finding of appropriateness.  See id. at 1224–27.

In contrast, DOJ relies primarily on the district court's decision in Disability Advocates, Inc. v. Paterson.  [Doc. 448-1 at 12–13] (citing 653 F. Supp. 2d at 245–46).[22]  Based on the plaintiff's experts' testimony in that case, the district court found that the plaintiff

> prove[d] that virtually all of its constituents meet the essential eligibility requirements of supported housing.  For virtually all of [plaintiff's] constituents, nothing about their disabilities necessitates living in the Adult Homes as opposed to supported housing, nor would they require services that are not already provided to people living in supported housing.
>
> . . . .
>
> While [plaintiff] must show—and has successfully shown—that its constituents meet the essential eligibility requirements for supported housing, it is not [plaintiff's] burden to assess what specific supports each of its approximately 4,300 constituents would need once he or she is placed in supported housing.  Supported housing providers routinely do assessments as part of their work to determine the specific supports their clients require.

See 653 F. Supp. 2d at 256–58; cf. Joseph S. v. Hogan, 561 F. Supp. 2d 280, 291 (E.D.N.Y. 2008) ("it is not clear whether Olmstead even requires a specific

---

[22] The district court's order in Disability Advocates was subsequently vacated on the grounds that the organizational plaintiff lacked standing to bring its claims, but not on the grounds that it failed to offer evidence of the appropriateness of community-based treatment for the individuals at issue in that case.  See Disability Advoc., Inc. v. N.Y. Coal. for Quality Assisted Living, Inc., 675 F.3d 149 (2d Cir. 2012).

determination by *any* medical professional that an individual with mental illness may receive services in a less restrictive setting, or whether that just happened to be what occurred in <u>Olmstead</u>" (emphasis in original)); <u>Long v. Benson</u>, No. 08-cv-26 (RH/WCS), <u>2008 WL 4571904</u>, at \*2 (N.D. Fla. Oct. 14, 2008) (explaining that the State "cannot deny the right [to an integrated setting] simply by refusing to acknowledge that the individual could receive appropriate care in the community" because "[o]therwise the right would, or at least could, become wholly illusory").

Thus, no controlling precedent imposes the requirement of individualized student review that the State attempts to transpose onto this case, which is factually distinguishable from <u>Olmstead</u> in key respects, including the fact that IEP teams, not treating physicians, determine when to recommend a student enter or exit GNETS. <u>See</u> <u>Olmstead</u>, <u>527 U.S. at 603</u>.  Additionally, DOJ presents evidence sufficient to create a factual dispute regarding whether the students at issue can be appropriately served in community (general education) settings.  For example, DOJ's expert witness, Dr. McCart, opines that based on her three (3)-year-long review of over 500 students' records (including IEPs), seventy (70) site visits to GNETS programs, and classroom observations of nearly 1,000 students enrolled in GNETS, the "vast majority of students in the GNETS Program can and should be served in integrated

settings with appropriate services and supports[.]"[23]   See McCart Rep. at 157; see also Deposition of Dr. Amy McCart ("McCart Dep.") at 145:6–146:12 [Doc. 480]. One exhibit submitted by DOJ directly concerns a student whose IEP team recommended that he exit GNETS, but who was subsequently placed back in a GNETS program without any evaluation or IEP recommendation supporting the same, even despite his IEP team's determination that continuing school in GNETS "would have an adverse effect on [the student]."   [See Doc. 450-12 at 11–16]. Therefore, the State fails to demonstrate the lack of evidence supporting DOJ's position that students in GNETS can be appropriately served in community (general education) settings.   Accordingly, the Court finds that the State's motion is due to be denied on the appropriateness prong.

### ii.   Non-opposition

The ADA does not mandate that "community-based treatment be imposed on [those] who do not desire it."   Olmstead, 527 U.S. at 602.   The State contends that "DOJ has provided no evidence indicating that an individual referred by that student's IEP Team for GNETS services seeks community placement" in a general education setting.   [Doc. 429-1 at 23].

---

[23] During oral argument at the April 18, 2024 hearing, counsel for DOJ corrected the record regarding the number of students whose records were reviewed by Dr. McCart.

The State's assertion does not comport with the factual record before the Court, which is rife with examples of parents (and in one instance, a treating physician) opposing new, continuing, or repeated placement of their children/students in GNETS.[24] [E.g., Docs. 450-2 (parent email to GNETS Program Manager stating "I have made it very clear that I do not wish for my daughter to continue in the [GNETS] program" and that the parent wanted the child to return to her community school in the school district where the family lived); 450-4; 450-5; 450-6; 450-7; 450-8; 450-9 at 4 (due process complaint based on continued GNETS placement); 450-10 (due process complaint based on continued GNETS placement); 450-11 (due process complaint based on continued GNETS placement); 450-12 (due process complaint based on continued GNETS placement); 450-14 at 3 (parent requesting to discontinue GNETS services); 450-15 (parent requesting to transition child out of GNETS program); 450-23 at 2 (letter from student's treating physician to that student's GNETS program certifying his disabilities and requesting that the student "needs to be mainstreamed" back into a general education setting); 450-24; 450-25].   And even if DOJ did not provide this evidence, it would not be dispositive; as one district court aptly summarized,

> defendants cannot establish compliance with the [I]ntegration [M]andate by showing that class members never requested community

---

[24] The State's characterization of this evidence as "hearsay" is unavailing because "evidence does not have to be authenticated or otherwise presented in an admissible form to be considered at the summary judgment stage, as long as the evidence could ultimately be presented in an admissible form." Marcus & Millichap, 991 F.3d at 1156 n.2.

placement. The Supreme Court's reasoning in [the plurality opinion of] <u>Olmstead</u> makes it clear that a state must do more than wait until the residents of its facilities have affirmatively asked to be placed in the state's integrated residential settings; the state's failing in <u>Olmstead</u> was that it did not place the residents even after its "own professionals had determined that community-based treatment would be appropriate for [the two (2) residents] and neither woman opposed such treatment." <u>Olmstead</u>, <u>527 U.S. at 603</u>[.] The regulations do not conceive of a resident's option to decline community placement as a right that is to be exercised before any professional judgment has been brought to bear. Rather, the regulations state that "persons with disabilities must be provided the option of declining to accept a *particular* accommodation." 28 C.F.R. pt. 35, App. A, p. 350 (1998) (emphasis added); quoted in <u>Olmstead</u>, <u>527 U.S. at 603</u>[.]

<u>Messier v. Southbury Training Sch.</u>, <u>562 F. Supp. 2d 294, 337</u>–38 (D. Conn. 2008).

Here, DOJ's expert Dr. McCart testified during her deposition that she reviewed documents where parents expressed concern with their students being placed in GNETS because "there were no[] other options" made available. <u>See</u> McCart Dep. at 57:17–20. This, and other evidence directly from parents, supports the existence of a genuine dispute of material fact as to whether parents, and by extension, the affected students, were afforded any meaningful choice when the students were placed (or kept) in GNETS such that they could insist on different placement. [<u>E.g.</u>, Docs. 450-16, 450-17]; <u>Olmstead</u>, <u>527 U.S. at 603</u>; <u>Messier</u>, <u>562 F. Supp. 2d at 337</u>–38 ("persons with disabilities must be provided the option of declining to accept a *particular* accommodation" (internal quotation omitted)).

In sum, record evidence demonstrates that individuals object to GNETS placements and desire to be transitioned back to general education (community)

settings.   Put differently, these individuals do not oppose community-based treatment; to the contrary, they desire it.  Accordingly, the Court finds that the State's motion is due to be denied on the non-opposition prong.

### iii.   Reasonable accommodation

The State argues that DOJ fails to present evidence in support of the third prima facie element of a Title II claim: that its proposed accommodations for the students at issue can be reasonably accommodated by the State.  [See Doc. 429-1 at 24–27].  A Title II plaintiff seeking community-based treatment must demonstrate that the proposed "placement can be reasonably accommodated, taking into account the resources available to the State and the needs of others with . . . disabilities." See Olmstead, 527 U.S. at 607.   A plaintiff makes "a prima facie showing that a reasonable accommodation is available" when the plaintiff "suggests the existence of a plausible accommodation, the costs of which, facially, do not clearly exceed its benefits[.]"  Henrietta D. v. Bloomberg, 331 F.3d 261, 280 (2d Cir. 2003).

The Olmstead plurality opinion recognized that "[t]he State's responsibility, once it provides community-based treatment to qualified persons with disabilities, is not boundless."  Olmstead, 527 U.S. at 603.  A state need not "make modifications that entail a 'fundamenta[l] alter[ation]' of the State['s] services and programs."  Id. (internal citation omitted).  The relevant regulation provides that "[a] public entity shall make reasonable modifications in policies, practices, or procedures when the

modifications are necessary to avoid discrimination on the basis of disability, *unless* the public entity can demonstrate that making the modifications would fundamentally alter the nature of the service, program, or activity."  28 C.F.R. § 35.130(b)(7)(i) (emphasis added).  As the Third Circuit succinctly set forth:

> Under this scheme, the plaintiff first bears the burden of articulating a reasonable accommodation.  The burden of proof then shifts to the defendant, who must establish that the requested relief would require an unduly burdensome or fundamental alteration of state policy in light of its economic resources and its obligations to other . . . persons [with disabilities] in the institutional setting.

Frederick L. v. Dept. of Pub. Welfare of Com. of Pa., 364 F.3d 487, 492 n.4 (3d Cir. 2004); accord Willis v. Conopco, Inc., 108 F.3d 282, 286 (11th Cir. 1997) (explaining, in an ADA employment action, that showing a "reasonable accommodation" is "an element of [a] plaintiff's case" while "undue burden" is "an affirmative defense" to be raised by a defendant); Henrietta D., 331 F.3d at 280 (explaining that once a plaintiff makes a prima facia showing of an available reasonable accommodation, the burden "of nonpersuasion falls on the defendant").  In sum, the plaintiff in a Title II action bears the burden to show the availability of a reasonable accommodation, and thereafter, the burden shifts to the defendant to raise the affirmative defense of fundamental alteration (or undue burden) to demonstrate the unreasonableness of the proposed accommodation.  See Olmstead, 527 U.S. at 607; 28 C.F.R. § 35.130(b)(7)(i).

In the matter at bar, the reasonable accommodation DOJ proposes is "an expansion of the key integrated therapeutic services and supports that help students with behavior-related disabilities avoid restrictive educational placements" that "the State already offers but fails to provide in sufficient amount and intensity or consistent with its own standards."[25] [Doc. 448-1 at 23] (citing Putnam Rep. at 23–29, 32–55). Additionally, DOJ seeks "modifications" in the form of "robust training and technical assistance for educational and therapeutic staff and improving coordination and data-sharing across the State's child-serving agencies and community partners." [Id. at 24–25]. The State contends that DOJ cannot show the reasonableness of its proposed accommodations for three (3) reasons: (1) "reasonableness is determined on an individualized, case-by-case basis" and "DOJ has not even tried to satisfy this requirement[,]" (2) DOJ's experts failed to perform a "cost or workforce study to measure the reasonableness of their recommendations[,]" and (3) DOJ seeks to improperly impose on the State a

---

[25] The Eleventh Circuit has observed that "DOJ regulations for Title II impose the requirement of 'reasonable modifications' to procedures to avoid the discrimination prohibited by Title II." Bircoll, 480 F.3d at 1082 n.13 (internal citations omitted). Unlike the instant case, there was no argument in Bircoll "that the DOJ's Title II regulations go beyond the statutory authority of the ADA[,]" and the Eleventh Circuit did not reach that issue. See id. (citing Olmstead, 527 U.S. at 592). Although the validity of DOJ regulations *is* challenged by the State here, no binding authority compels this Court to declare those regulations invalid. See supra, part III.B.2.b. Thus, the Eleventh Circuit's guidance that "reasonable modifications" may be ordered to "avoid"—or prevent—"the discrimination prohibited by Title II" lends support to DOJ's proposed accommodations as applied to students who are substantially at risk of being placed in GNETS. Bircoll, 480 F.3d at 1082 n.13 (internal citations omitted).

"standard of care" regarding the quality and range of services the State offers to students with behavior-related disabilities.  [Doc. 429-1 at 25–26].

First, in support of its argument that DOJ must, as a matter of law, demonstrate the reasonableness of its proposed accommodations as to each individual student, the State relies on a few select words from the Eleventh Circuit's opinion in Bircoll v. Miami-Dade County.  [See Docs. 429-1 at 25; 470 at 14–15] (both citing 480 F.3d at 1086).  In Bircoll, the plaintiff, a deaf man, was pulled over by a police officer at approximately 3:00 a.m. after the officer observed the plaintiff failing to make a proper stop while driving.  See 480 F.3d at 1075–76.  As the officer began to administer field sobriety tests to the plaintiff during the traffic stop, the plaintiff requested an interpreter, but the officer did not call one.  See id. at 1077.  The plaintiff was ultimately arrested and charged with driving under the influence.  Id. at 1080.  As a result, the plaintiff brought suit and claimed "that the police failed to make reasonable modifications to their procedures to ensure effective communication, thereby subjecting him to discrimination in violation of the ADA." Id. at 1085.  On appeal, the Eleventh Circuit focused on whether the plaintiff's request for an interpreter before his arrest was reasonable:

> In other words, the question is whether, given criminal activity and safety concerns, any modification of police procedures is reasonable before the police physically arrest a criminal suspect, secure the scene, and ensure that there is no threat to the public or officer's safety.  The reasonable-modification inquiry in Title II [] ADA cases is "a highly

fact-specific inquiry." <u>See</u> <u>Holbrook v. City of Alpharetta</u>, <u>112 F.3d 1522, 1527</u> (11th Cir. 1997) (stating, in a Title I [] ADA reasonable accommodation case, that "what is reasonable for each individual employer is a highly fact-specific inquiry that will vary depending on the circumstances and necessities of each employment situation"). We emphasize that *terms like ["]reasonable["] are relative to* the *particular circumstances of the case* and the circumstances of a DUI arrest on the roadside are different from those of an office or school or even a police station. *What is reasonable must be decided case-by-case* based on numerous factors.

Here, [the plaintiff] claims that he requested an interpreter, which [the officer] denies. Even assuming [the plaintiff] asked for an oral interpreter, we conclude that waiting for an oral interpreter before taking field sobriety tests is not a reasonable modification of police procedures given the exigent circumstances of a DUI stop on the side of a highway, the on-the-spot judgment required of police, and the serious public safety concerns in DUI criminal activity.

<u>Id.</u> at 1085–86 (emphasis added).

The State relies entirely on the emphasized language in the foregoing excerpt to support its argument that DOJ must produce "individualized" evidence for each student to support the reasonableness of the accommodations proposed by DOJ's experts. [<u>See</u> Docs. 429-1 at 25; 470 at 14–15]. The Court does not agree with the State's strained interpretation of the <u>Bircoll</u> decision and declines the State's invitation to create a new standard that injects a requirement for "individualized" evidence. Rather, the Court applies the established standards for discerning the reasonableness of a proposed accommodation.

Second, the State claims that DOJ's proposals fail on the reasonableness prong because DOJ's experts did not perform a "cost or workforce study to measure the reasonableness of their recommendations." [Doc. 429-1 at 25–26]. However, the State cites to no caselaw that imposes this burden on a plaintiff to survive summary judgment on Title II claims. [See generally id.; see also Doc. 470]. Crucially, the plurality opinion in Olmstead did not impose such a requirement, as the State suggests. [Doc. 470 at 16] (citing 527 U.S. at 606 n.16). In that case, prior to the Supreme Court's opinion later in the appeal, the Eleventh Circuit had ruled that "[u]nless the State can prove that requiring it to make these additional expenditures would be so unreasonable given the demands of the State's mental health budget that it would fundamentally alter the service it provides, the ADA requires the State to make these additional expenditures." L.C. by Zimring v. Olmstead, 138 F.3d 893, 905 (11th Cir. 1998), aff'd in part, vacated in part, remanded sub nom. Olmstead, 527 U.S. 581. Upon review, the Supreme Court plurality rejected the Eleventh Circuit's "restrictive reading" "of the reasonable-modifications regulation" and noted that Congress requires "[t]he Attorney General's Title II regulations[] . . . [']be consistent with' the regulations implementing § 504 of the Rehabilitation Act." See Olmstead, 527 U.S. at 606 n.16 (quoting 42 U.S.C. § 12134(b)).

The § 504 regulation upon which the reasonable-modifications regulation is based provides now, as it did at the time the ADA was enacted:

> "A recipient shall make reasonable accommodation to the known physical or mental limitations of an otherwise qualified handicapped applicant or employee unless the recipient can demonstrate that the accommodation would impose an undue hardship on the operation of its program." 28 C.F.R. § 41.53 (1990 and 1998 eds.).

> While the part 41 regulations do not define "undue hardship," other § 504 regulations make clear that *the "undue hardship" inquiry requires not simply an assessment of the cost of the accommodation in relation to the recipient's overall budget*, but a "case-by-case analysis weighing factors that include: (1)[t]he overall size of the recipient's program with respect to number of employees, number and type of facilities, and size of budget; (2)[t]he type of the recipient's operation, including the composition and structure of the recipient's workforce; and (3)[t]he nature and cost of the accommodation needed." 28 C.F.R. § 42.511(c) (1998); see 45 C.F.R. § 84.12(c) (1998) (same).

Id. (alterations in original and emphasis added). Thus, the plurality in Olmstead expressed that "[u]nder the Court of Appeals' restrictive reading," which only considered the cost of the proposed accommodations for the Olmstead plaintiffs in relation to the State's overall budget, "the reasonable-modifications regulation would impose a standard substantially more difficult for the State to meet than the 'undue burden' standard imposed by the corresponding § 504 regulation." See id. The Court does not interpret the foregoing as evidentiary requirements for DOJ's

Title II claims to survive summary judgment, as the State contends; rather, the Court reads it as a list of factors to consider in assessing the State's evidence that a proposed accommodation is not reasonable.[26]  See id.  For this reason, the State's argument that DOJ was obligated to perform a cost and workforce analysis falls short.

Third, the Court disagrees with the State that DOJ seeks to improperly impose on the State a "standard of care" regarding the quality and range of services the State offers to students with behavior-related disabilities.  [Doc. 429-1 at 25–26].  Writing for the Supreme Court plurality in Olmstead, Justice Ginsburg explained:

> We do not in this opinion hold that the ADA imposes on the States a "standard of care" for whatever medical services they render, or that the ADA requires States to "provide a certain level of benefits to individuals with disabilities."  Cf. post, at 2198 (Thomas, J., dissenting).  We do hold, however, that States must adhere to the ADA's nondiscrimination requirement with regard to the services they in fact provide.

See 527 U.S. at 603 n.14.  Therefore, "a State may not be forced to create a community-treatment program where none exists."  Id. at 612–13 (Kennedy, J., concurring) ("Grave constitutional concerns are raised when a federal court is given

---

[26] The State seeks to introduce its own "analysis of cost and workforce [] for Dr. Putnam's proposed remedy[]" of "expanding Apex into every school" through the Declaration of Dante McKay, which the State argues demonstrates "that DOJ's proposed modifications are not reasonable and would constitute a fundamental alteration of the State's programs, thus warranting summary judgment."[26]  See McKay Declaration; [see also 429-1 at 25–26].  DOJ moves to strike or exclude Mr. McKay's Declaration at summary judgment and trial.  [Doc. 439-1].  The Court discusses the McKay Declaration below.  See infra, part IV.B.

the authority to review the State's choices in basic matters such as establishing or declining to establish new programs.  It is not reasonable to read the ADA to permit court intervention in these decisions.").   But DOJ's expert witness Dr. Robert Putnam opines that the subject students could be reasonably accommodated in a cost-effective manner by the State if it expanded supports and services that *already exist* and are recognized as effective (including the State's Apex program), implemented additional training for educational and therapeutic staff, and leveraged the resources available through Medicaid/PeachCare.  See Putnam Rep. at 20–32, 58–60.  These are not the sort of new or forced "accommodations" that Olmstead prohibits.  See 527 U.S. at 603 n.14, 613–14.  Instead, these proposals meet the standard of suggesting "the existence of a plausible accommodation, the costs of which, facially, do not clearly exceed its benefits."  Henrietta D., 331 F.3d at 280. Accordingly, the Court finds that the State's motion is due to be denied on this issue, since genuine disputes of material fact remain as to the reasonableness of DOJ's proposed accommodations.

> b.    *Unequal educational opportunities*

Next, the State argues that DOJ is precluded from proceeding on its disability discrimination claim based on unequal educational opportunities because such a claim arises exclusively under the Individuals with Disabilities Education Act ("IDEA"), 20 U.S.C. § 1401(32).  [Doc. 429-1 at 29–31] (citing Fry v. Napoleon

72

Cmty. Sch., 580 U.S. 154, 171 (2017)).   This argument reflects a basic misunderstanding of how the IDEA and Title II of the ADA interact.   As the Eleventh Circuit has explained:

> The IDEA "guarantees individually tailored educational services," whereas Title II and § 504 [of the Rehabilitation Act] "promise non-discriminatory access to public institutions"—specifically aiming "to root out disability-based discrimination, enabling each covered person . . . to participate equally to all others in public facilities and federally funded programs." Fry[], [580 U.S. at 170].   Courts have recognized that there is often "some overlap in coverage" across these statutes and that "[t]he same conduct might violate all three statutes."   Id.

J.S., III, 877 F.3d at 985.   Thus, the Court rejects the State's contention that the IDEA preempts DOJ's claim based on unequal educational opportunities.   [Doc. 429-1 at 29–31].

Additionally, the State contends that DOJ must produce evidence of discriminatory intent to proceed on its unequal educational opportunities claim because it is a disparate impact claim.   [Id. at 27–28].   Although it is true that a Title II plaintiff who seeks monetary damages may be required to show the discriminatory intent of the defendant, that requirement does not apply where no monetary damages are sought, as is the case here.   See Sheely v. MRI Radiology Network, P.A., 505 F.3d 1173, 1191 (11th Cir. 2007) (stating that "victims of intentional discrimination may recover compensatory damages" while "victims of unintentional discrimination may be limited to prospective relief preventing future violations"); Boudreau v. Nocco, No. 8:21-CV-1158-VMC-AEP, 2022 WL 17812876, at *6 (M.D. Fla. Nov.

2, 2022) ("While it is not necessary to prove discriminatory intent in order to prove a violation of the ADA . . ., it is when a plaintiff seeks to recover compensatory damages."), report and recommendation adopted, 2022 WL 17369636 (M.D. Fla. Dec. 2, 2022); see also Davis, 821 F.3d at 260 ("While claims for damages under Title II require proof of discriminatory animus, claims for injunctive relief demand no such showing."); Henrietta D., 331 F.3d at 273 ("Our threshold question therefore is whether a Title II plaintiff who wishes to proceed on a reasonable accommodation theory must in any event also establish disparate impact. . . . We follow our fellow circuits, and the suggestions of the Olmstead plurality, in concluding that it does not." (citing 527 U.S. at 598)). Further, the language of 28 C.F.R. § 35.130(b)(3) prohibits a public entity from directly or indirectly "utiliz[ing] criteria or methods of administration . . . [that] *have the effect of* subjecting qualified individuals with disabilities to discrimination on the basis of disability" or the "*effect of* defeating or substantially impairing accomplishment of the objectives of the public entity's program with respect to individuals with disabilities[.]"[27]    28 C.F.R. § 35.130(b)(3)(i)–(ii) (emphasis added).   This language in the implementing regulations reflects Congress' intent "to remedy the effects of benign neglect resulting from the invisibility of the disabled" in enacting the ADA, since the ADA

---

[27] Here, the State again argues it is not the public entity that "administers" the GNETS program, but the Court rejects this contention above. See supra, part III.B.2; [see also Doc. 429-1 at 33]; 28 C.F.R. § 35.130(b)(3).

is not limited "to circumstances involving deliberate discrimination." Helen L. v. DiDario, 46 F.3d 325, 335 (3d Cir. 1995) (internal quotation marks omitted). Accordingly, the Court finds the State's motion is due to be denied with regard to DOJ's unequal educational opportunities claim.

## IV.    Motions to Exclude

Both Parties seeks to exclude expert witnesses proffered by the other (namely, Drs. Robert Putnam and Amy McCart, offered by DOJ, and Dr. Andrew Wiley, offered by the State) and DOJ seeks to exclude the McKay Declaration. The Court assesses these challenges below.

### A.    Expert Witnesses

Federal Rule of Evidence 702 governs the admissibility of expert testimony and provides:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:
>
> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
>
> (b) the testimony is based on sufficient facts or data;
>
> (c) the testimony is the product of reliable principles and methods; and
>
> (d) the expert has reliably applied the principles and methods to the facts of the case.

FED. R. EVID. 702. Although the face of the rule provides the Court with only limited guidance as to when expert testimony is admissible, the Supreme Court's opinion in Daubert v. Merrell Dow Pharms., Inc., 509 U.S. 579 (1993), is instructive. As the Court observed in that opinion, "[u]nlike an ordinary witness, . . . an expert is permitted wide latitude to offer opinions, including those that are not based on firsthand knowledge or observation." Daubert, 509 U.S. at 592. However, a jury may find it difficult to evaluate an expert's opinion. See id. Trial courts are therefore tasked with acting as "gatekeepers" to ensure that a proposed expert's testimony is not only relevant, but reliable. Id. To that end, district courts are "charged with screening out experts whose methods are untrustworthy or whose expertise is irrelevant to the issue at hand." Corwin v. Walt Disney Co., 475 F.3d 1239, 1250 (11th Cir. 2007).

In performing this gatekeeping function, a trial court must engage in a "rigorous three-part inquiry" to determine whether:

> (1) the expert is qualified to testify competently regarding the matters he intends to address; (2) the methodology by which the expert reaches his conclusions is sufficiently reliable as determined by the sort of inquiry mandated in Daubert; and (3) the testimony assists the trier of fact, through the application of scientific, technical, or specialized expertise, to understand the evidence or to determine a fact in issue.

United States v. Frazier, 387 F.3d 1244, 1260 (11th Cir. 2004) (quoting City of Tuscaloosa v. Harcros Chems., Inc., 158 F.3d 548, 562 (11th Cir. 1998)). Although the three (3) prongs of this analysis inevitably overlap, trial courts must be cautious

not to conflate them, and the proponent of expert testimony bears the burden to show that each requirement is met.  Id.; Cook ex rel. Est. of Tessier v. Sheriff of Monroe Cnty., 402 F.3d 1092, 1113–14 (11th Cir. 2005).

While many factors bear on the Court's inquiry, there is no definitive checklist.  See Maiz v. Virani, 253 F.3d 641, 665 (11th Cir. 2001); see also United States v. Scott, 403 F. App'x 392, 397 (11th Cir. 2010) (finding that Daubert provides only general guidelines and that the trial judge has "considerable leeway in deciding in a particular case how to go about determining whether particular expert testimony is reliable" (quoting Kumho Tire Co. v. Carmichael, 526 U.S. 137, 152 (1999))).  There are multiple ways, for instance, that an individual may be qualified to give expert testimony.  Indeed, the text of Rule 702 makes clear that expert status may be based on "knowledge, skill, experience, training, *or* education."  FED. R. EVID. 702 (emphasis added) advisory committee's notes to 2000 amendment ("Nothing in this amendment is intended to suggest that experience alone . . . may not provide a sufficient foundation for expert testimony.").

Likewise, Daubert sets forth a list of "general observations" regarding the reliability of a proposed expert's testimony.  Factors to be considered include: (1) whether the expert's theory can be and has been empirically tested; (2) whether the expert's theory has been subjected to peer review and publication; (3) the known or potential error rate of the expert's theory and whether that rate is acceptable; and

(4) whether the expert's theory is generally accepted in the scientific community. See Daubert, 509 U.S. at 593–94.  Importantly, not every factor "will apply in every case, and in some cases other factors will be equally important in evaluating the reliability of proffered expert opinion."  Frazier, 387 F.3d at 1262; accord Kumho Tire, 526 U.S. at 150 ("[W]e can neither rule out, nor rule in, for all cases and for all time the applicability of the factors mentioned in Daubert, nor can we now do so for subsets of cases categorized by category of expert or by kind of evidence.  Too much depends upon the particular circumstances of the particular case at issue."); FED. R. EVID. 702 advisory committee's notes to 2000 amendment.  Thus, the trial court has considerable leeway to determine whether proffered expert testimony is reliable. Frazier, 387 F.3d at 1262.

Finally, the district court must assess whether the expert testimony will assist the trier of fact.  Put another way, the court must ask whether the expert testimony "concerns matters that are beyond the understanding of the average lay person."  Id. If the proffered expert testimony "offers nothing more than what lawyers for the parties can argue in closing arguments," it should not be admitted.  Id. at 1262–63.

Having set forth the relevant legal standard, the Court now turns to the Parties' respective motions to exclude or partially exclude the other's expert(s).  The Court begins with the motions tendered by the State and then addresses the motions submitted by DOJ.

1.      State's motion to exclude Dr. Robert Putnam

The State moves to exclude the expert testimony of Dr. Robert Putnam, one of DOJ's expert witnesses, on the grounds that his opinions are both irrelevant and unreliable.  [See Doc. 428 at 11–17].  In support, the State contends that (1) appropriateness "is an individualized determination" and "Dr. Putnam did not analyze any individual student for what would constitute appropriate services based on the unique needs of that student"; and (2) Dr. Putnam's methodology that led to his conclusions contains "a series of critical flaws" that render his opinions unreliable, including those about the reasonableness of his proposed accommodations.[28]  [Doc. 428 at 11–17].  DOJ responds in opposition that Dr. Putnam's opinions are relevant and his methodology is sound.  [Doc. 438 at 5–7, 9–25].  Notably, DOJ represents in its brief that Dr. Putnam's opinions are proffered to support the reasonable accommodation prong of the Title II claims at bar—not the appropriateness prong.  [Id. at 4, 9].  Accordingly, the Court limits its discussion here to Dr. Putnam's opinions regarding reasonable accommodations.

---

[28]  The State also contends Dr. Putnam's opinions about reasonableness of his proposed accommodations are irrelevant because he "did not consider Georgia's available workforce" or conduct a "cost analysis [to] show his recommendations are actually feasible in a balanced[-]budget state such as Georgia" and he "misunderstood the [GaDOE's] . . . . ability to compel local school districts to adopt . . . or accept" training that he recommends.  [Docs. 428 at 11–12; 455 at 3–4] (internal citations omitted).  But as the Court explained earlier in this order, the State does not offer (nor does the Court locate) any binding authority that imposes such requirements on a Title II plaintiff.  See supra, part III.B.2.a.iii.

79

Although the State does not squarely challenge Dr. Putnam's qualifications as part of its instant motion, the Court finds the following context from DOJ's brief in opposition to be germane to the discussion at hand:

> [Dr.] Putnam[ is] a licensed psychologist and Doctoral-level Board-Certified Behavior Analyst with over 50 years of experience working with and on behalf of children with behavior-related disabilities at risk of restrictive educational or residential placement.  Dr. Putnam is a national authority on integrating school- and community-based behavioral health services through multi-tiered systems of support ("MTSS").  He has authored numerous peer-reviewed articles on the topics of MTSS, Positive Behavioral Intervention and Supports ("PBIS"), and supporting students with behavior-related disabilities in integrated educational settings.  In his capacity as Executive Vice President of the May Institute, Dr. Putnam has provided consultation to states and school districts across the country regarding their implementation of evidence-based therapeutic services and supports that can prevent restrictive educational placements.

[Doc. 438 at 4–5] (citing Putnam Rep. at 1–4).[29]

First, the Court finds Dr. Putnam's opinions to be relevant.  Whether the State can reasonably accommodate DOJ's proposal(s) is a central issue in this case.  See supra, part III.B.2.a.iii.  Dr. Putnam opines in his report that "the State could reasonably reduce its reliance on the GNETS Program by expanding" access to services that "already exist in Georgia" and "help students with behavior-related disabilities remain in more integrated educational settings[,] including "Functional Behavior Assessments and Behavior Intervention Plans, Wraparound Services,

---

[29] Dr. Putnam's qualifications are fully set forth in his curriculum vitae, which is attached to his expert report.  [Doc. 428-1 at 70–100].

Individual and Group Counseling, and Family and Community Supports (collectively, the 'Core Services')[,]" in addition to other measures like implementing data-driven practices such as MTSS and PBIS and enhancing inter-agency coordination to deliver services to students.  [See Doc. 438 at 10–11]; see also Putnam Rep. at 6–13, 22–32.  Although the State contends Dr. Putnam should have reviewed the educational files of the thousands of individual students either currently in GNETS or at substantial risk of being placed in GNETS to render his opinions relevant, the Court rejects this argument. The helpfulness requirement of Daubert "goes primarily to relevance" and the "basic standard of relevance . . . is a liberal one." See Daubert, 509 U.S. at 587.  And the relevancy requirement of Rule 702 "requires that the evidence or testimony assist the trier of fact to understand the evidence or to determine a fact in issue." Id. at 591 (internal quotation marks omitted).  Only that "[e]xpert testimony which does not relate to any issue in the case is not relevant and, ergo, non-helpful." Id. at 591 (internal quotation marks and citation omitted).  Accordingly, the Court rejects the State's motion on the basis of relevance because potential reasonable accommodations are an issue in this case and Dr. Putnam's expert testimony in that regard could assist the trier of fact.

Second, the Court finds Dr. Putnam's opinions are sufficiently supported and reliable to be admissible.  The State's objections to the contrary go to the weight, not the admissibility, of Dr. Putnam's testimony.  [Doc. 428 at 13–17].  Although

the State characterizes Dr. Putnam's opinions as no more than *ipse dixit* [see id. at

16], the State's motion almost entirely glosses over the methodology Dr. Putnam set

forth in his report.  See Putnam Rep. at 4–6.  Among other things, Dr. Putnam wrote

that his opinions are based on:

- "decades of expertise in behavioral psychology, applied behavior analysis, special education, and behavior interventions[,]" including his "50 years of experience serving students with behavioral health disabilities";

- a literature review of "research and scholarly papers, issue briefs, [and] accepted professional standards";

- site visits to twenty-seven (27) GNETS settings, including facility tours, classroom observation, and staff interviews;

- "transcripts of depositions, including the testimony of current and former GaDOE staff responsible for GNETS and PBIS, and current and former DBHDD and service provider staff responsible for Apex and other behavioral health services";

- "data publicly available on Georgia state agencies' websites and data produced by the State in this litigation" including "information about GNETS, Medicaid-reimbursable services, Apex services, PBIS implementation, the COE, and other information related to behavioral health services"; and

- documents that describe the State's existing infrastructure.

See id. at 4–6.  Attached to Dr. Putnam's report is an appendix listing the over 500

materials he reviewed and considered in forming his opinions, followed by an

appendix setting forth the site visit information for the GNETS programs Dr. Putnam

observed in person.  [Doc. 428-1 at 101–14].

The State nonetheless characterizes Dr. Putnam's methodology as unreliable because it is overly generalized and has not been peer reviewed, his report does not contain a rate of error, and, according to the State, "there was no evidence that his methods have been approved by the academic community." [Doc. 455 at 13–15]. Here, the State attempts to transform Daubert's flexible list of "general observations" for assessing the reliability of proposed expert testimony into a checklist of mandates, despite the long-established principle that not every factor "will apply in every case, and in some cases other factors will be equally important in evaluating the reliability of proffered expert opinion." Frazier, 387 F.3d at 1262. This effort is misguided.  Where, as here, the "factual basis, data, principles, methods, or their application" underlying an expert opinion "are called sufficiently into question, . . . the trial judge must determine whether the testimony has 'a reliable basis in the knowledge and experience of [the relevant] discipline.'" Kumho Tire, 526 U.S. at 149 (alteration in original) (quoting Daubert, 509 U.S. at 592). "It might not be surprising in a particular case, for example, that a claim made by a scientific witness has never been the subject of peer review, for the particular application at issue may never previously have interested any scientist." Id. at 151.  It cannot be said that Dr. Putnam's "discipline itself lacks reliability" like the fields of "astrology or necromancy." Id.  Dr. Putnam clearly possesses the basis in knowledge of and experience in the discipline of special education necessary to render expert

testimony. As such, the State's misgivings about his opinions are the proper subject for cross-examination instead of exclusion. <u>E.g.</u>, <u>Daubert</u>, <u>509 U.S. at 596</u> ("Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence."); <u>Johnson v. ABF Freight Sys., Inc.</u>, No. 2:18-CV-01835-MHH, <u>2020 WL 7320994</u>, at *3 (N.D. Ala. Dec. 11, 2020) (a reliable methodology with "inaccurate or improper data" or that involves a "failure to include variables" goes to weight and not admissibility); <u>Demarzo v. Healthcare Trust of Am., Inc.</u>, <u>565 F. Supp. 3d 1253, 1257</u> (S.D. Fla. 2021) (holding that the "potential flaws" in the expert's methodology went to the testimony's weight rather than admissibility). Accordingly, the Court denies the State's motion to exclude Dr. Putnam. [<u>Doc. 428</u>].

### 2. State's motion to exclude Dr. Amy McCart

The State moves to exclude the testimony of Dr. McCart, who DOJ tenders as an expert witness on "the extent to which the GNETS Program unnecessarily segregates and provides unequal educational opportunities to students with behavior-related disabilities."[30] [<u>See</u> Docs. 431; 432-2; 440 at 2]. According to the State, Dr. McCart's opinions should be entirely excluded because she "employs a

---

[30] The State does not challenge Dr. McCart's qualifications as part of its motion to exclude. [<u>See generally</u> <u>Doc. 432-2</u>]. Nevertheless, the Court has reviewed Dr. McCart's expert report and is satisfied that she is qualified to offer the opinions therein.

different definition of 'unnecessary segregation' than the one articulated by the Supreme Court of the United States in <u>Olmstead</u>" because Dr. McCart supposedly opines that *any* segregation of students with disabilities is unnecessary. [<u>Doc. 432-2 at 3</u>, <u>13</u>]. But Dr. McCart's own report and deposition testimony (some of which is cited in the State's motion) contradict the State's claim; Dr. McCart acknowledges that not *all* isolation is unjustified. [<u>Compare</u> Docs. 432-2 at 3, 13; 456 at 3–4], <u>with</u> McCart Rep. at 67 (explaining that "[i]n the GNETS Program, as within any student population across the country, there are a small number of students that" Dr. McCart believes require "individualized, quiet learning environments with low levels of interactions with others" or who "need to be taught in smaller learning environments away from their peers at certain times and under certain conditions"), 159 ("There are a small number of the nearly 1,000 students I observed who have very serious and extreme behaviors that require highly specialized teaching and behavioral support. . . . [But t]he needs of this small number of students requiring intensive supports should not justify the statewide segregation of thousands of students with behavior-related disabilities."), <u>and</u> McCart Dep. at 19:16–18 ("If you're asking whether or not it's appropriate to ever segregate students, yes.").

Additionally, the State argues that Dr. McCart's opinions are too generalized or lack reliable methodology, specifically, her opinion that "[t]he vast majority of students in the GNETS Program can and should be served in integrated settings with

appropriate services and supports, where they are more likely to experience social, emotional, behavioral, and academic success." [Docs. 432-2 at 3; 456 at 8]; McCart Rep. at 159.   The State's challenges to Dr. McCart's methodology are largely repetitive of the criticisms it levels against Dr. Putnam's methodology; similar to Dr. Putnam's opinions, the State claims Dr. McCart's opinions amount to little more than *ipse dixit*, are irrelevant because it disagrees with her conclusions, or characterizes them as improper opinions about quality and quantity of services.[31] [See Docs. 432-2 at 25–27; 456 at 9–11 (citing Elec. Co. v. Joiner, 522 U.S. 136, 146 (1997))].   These arguments fail for the same reasons the State's arguments against Dr. Putnam fail.   See supra, part IV.A.1.   The Court finds that Dr. McCart at minimum "has 'a reliable basis in the knowledge and experience of [the relevant] discipline[,]'" and the State's objections go to the weight, not the admissibility, of Dr. McCart's testimony.   Kumho Tire, 526 U.S. at 149 (alteration in original) (quoting Daubert, 509 U.S. at 592).   This finding is supported by Dr. McCart's description of the evaluation she conducted through:

> a multi-year, multi-site examination of the GNETS Program using a
> comprehensive qualitative and quantitative methodology that included

---

[31] Much of the State's argument on this point revolves around Dr. McCart's supposed lack of understanding "about the governance of GNETS services" (since she testified that the GNETS continuum of services is established and provided by the State) or lack of knowledge about "the State appropriations process[.]"   [Doc. 432-2 at 10–11, 13–14].   The Court rejects the State's invitation to exclude Dr. McCart on this basis because it is unclear how or why this would impact Dr. McCart's testimony about appropriateness.   As for her testimony about reasonable accommodations, the State will have its opportunity to present rebuttal expert testimony to more fully explore its concerns as applied to Georgia specifically.

observation, record review, and interview analysis.  As part of my examination, I conducted 70 site visits to 27 center-based GNETS Program sites and 36 school-based GNETS Program sites across the State, reviewed thousands of relevant records produced by the State as well as the 24 regional GNETS programs, and attended (or reviewed testimony from) the depositions of numerous regional GNETS program directors.

See McCart Rep. at 1.  Dr. McCart attaches to her expert report a list of documents she reviewed while preparing her opinions.  [Doc. 432-1 at 214–21].  Additionally, she provides that her conclusions are "based on [her] extensive experience in statewide educational reforms focused on equity-based inclusive education using a multi-tiered system of support (MTSS)[,]" including "years of work with school districts and states to support inclusive practices for student with disabilities, particularly those students with the most significant needs and behavior-related disabilities" and that her "recommendations are rooted in established evidence of efficacy" as published in research by three (3) national centers funded by the United States Department of Education.  See McCart Rep. at 160–61.  Accordingly, the Court denies the State's motion to exclude Dr. McCart.  [Doc. 431].

### 3.    DOJ's motion to partially exclude Dr. Andrew Wiley

The State offers Dr. Andrew Wiley as a rebuttal expert in response to two (2) of DOJ's expert witnesses, Drs. Putnam and McCart.  [Doc. 479 at 2].  DOJ moves to partially exclude the opinions of Dr. Wiley, specifically, (1) any legal opinions (including any legal opinions about the ADA or IDEA) and (2) any opinion

testimony about the GNETS program, "including any regional GNETS program or the supports and services received by students placed in the GNETS Program." [Doc. 476-1 at 1–2, 18]. DOJ challenges Dr. Wiley's qualifications to offer these two (2) categories of opinions as well as the reliability of those opinions. [Id. at 1, 18]. The State responds in opposition that (1) Dr. Wiley does not offer any legal opinions about the IDEA and ADA; and (2) Dr. Wiley does not opine on GNETS or Georgia specifically, but rather, states that "separate settings are not always unnecessary and that provision of appropriate services does not always prevent segregation." [Doc. 479 at 9–10, 15–16].

The Court finds that DOJ's motion to partially exclude Dr. Wiley is due to be denied because its challenges go to the weight, not the admissibility, of Dr. Wiley's testimony. First, DOJ claims that all of Section I of Dr. Wiley's rebuttal report "sets forth his untrained legal analysis of the relationship between the requirements of the IDEA and Title II of the ADA" and constitutes "improper legal argument under the imprimatur of a purported expert." [Doc. 476-1 at 6]. The State asserts that Dr. Wiley's "discussions of the IDEA and ADA" merely respond to statements about these laws by DOJ's experts, provides context for "the difficult choices facing local education officials," or proffers "information about the state of academic opinion in the light of Drs. McCart's and Putnam's disputed claims that their 'full inclusion'

philosophy is the accepted standard." [Doc. 479 at 9–10].  Dr. Wiley summarizes

the purpose of Section I of his rebuttal report as follows:

> To determine whether one is "unnecessarily segregated" under the
> [ADA], one must also consider the detailed and complete framework
> for determining proper placement designed by the [IDEA], which
> includes relevant stakeholders like parents, teachers, etc. (i.e., those
> who know the children and their individual education needs best are
> tasked by federal law with determining the most appropriate
> individualized educational program for the individual student).
> Because DOJ's experts do not consider IDEA's processes and their
> effect on decisions related to a child's placement in their analysis, their
> assertions of "unnecessary segregation" of students is unsubstantiated.

See Rebuttal Expert Report of Dr. Andrew Wiley ("Wiley Rep.") at 3 [Doc. 476-2].

As previously noted, the Court rejects the State's argument that the IDEA

precludes DOJ's instant claims pursuant to Title II of the ADA.  See supra, part

III.B.2.b.  As the Supreme Court has explained and this Circuit has recognized, the

IDEA and Title II of the ADA have different purposes, although "there is often

'some overlap in coverage' across these statutes and that 'the same conduct might

violate'" both laws.  J.S., III, 877 F.3d at 985 (quoting Fry, 580 U.S. at 170).

However, upon review of Section I of Dr. Wiley's rebuttal report, the Court finds

that the opinions expressed therein are more properly addressed via cross-

examination than a motion to exclude.  "The purpose of rebuttal evidence is to

explain, repel, counteract, or disprove the evidence of the adverse party, and the

decision to permit rebuttal testimony is one that resides in the sound discretion of

the trial judge."  Frazier, 387 F.3d at 1269 (cleaned up) (quoting United States v.

Gold, 743 F.2d 800, 818 (11th Cir. 1984)).  Although Dr. Wiley's opinions in his

Section I may be "shaky" or ultimately of limited utility, "vigorous cross-

examination, presentation of contrary evidence, and careful instruction on the burden

of proof are the traditional and appropriate means of attacking shaky but admissible

evidence."  Quiet Tech. DC-8, Inc. v. Hurel-Dubois UK Ltd., 326 F.3d 1333, 1341

(11th Cir. 2003) (quoting Daubert, 509 U.S. at 596).  The Court therefore denies

DOJ's motion to exclude Dr. Wiley on this basis.  [Doc. 476].

Second, DOJ argues that Dr. Wiley should not be permitted to opine on the

GNETS program because he "did not evaluate the GNETS Program" as part of his

review and his opinions regarding GNETS therefore lack foundation and will be

unhelpful to the factfinder.  [Doc. 476-1 at 10–11].  Dr. Wiley and the State concede

that he did not conduct an evaluation of the GNETS program.  [See Doc. 479 at 15];

see also Deposition of Dr. Andrew Wiley ("Wiley Dep.") at 302:6–303:11, 306:6–

21 [Doc. 426].  However, the State maintains that Dr. Wiley's testimony was never

intended to be specific to GNETS—or even the State of Georgia specifically—but

instead to rebut Drs. McCart and Putnam's opinions regarding the viability of

supports and services for students with disabilities in integrated settings and when

separate educational placements are appropriate or warranted.  [See Doc. 479 at 16];

see also Wiley Rep. at 30–67.  The Court does not agree with DOJ that "there is 'too

great an analytical gap' between the facts of the case and the expert's opinion for the

testimony to be helpful." See Kelley v. C.R. Bard, Inc., 644 F. Supp. 3d 1316, 1323 (N.D. Ga. 2022) (quoting Knepfle v. J-Tech Corp., 48 F.4th 1282, 1294 (11th Cir. 2022)), on reconsideration in part sub nom. Kelley v. C.R Bard, Inc., Civil Action No. 2:20-CV-00045-SCJ, 2023 WL 2370109 (N.D. Ga. Jan. 24, 2023). "The proper course of action when a district court is faced with this 'battle of the experts' is to submit the question to the factfinder." Simmons v. Ford Motor Co., No. 18-CV-81558-RAR, 2022 WL 168540, at *8 (S.D. Fla. Jan. 18, 2022) (internal citation omitted); accord Worsham v. A.H. Robins Co., 734 F.2d 676, 682 (11th Cir. 1984). And even if there are flaws in Dr. Wiley's methodology because he did not evaluate the GNETS program, "failure to include variables" goes to weight and not admissibility of Dr. Wiley's opinions. See ABF Freight Sys., 2020 WL 7320994, at *3; see also Demarzo, 565 F. Supp. 3d at 1257 (holding that the "potential flaws" in the expert's methodology went to the testimony's weight rather than admissibility). Accordingly, the Court denies DOJ's motion to exclude Dr. Wiley on this second basis, as well. [Doc. 476].

### B. DOJ's Motion to Exclude the McKay Declaration

DOJ moves to strike or exclude the Declaration of Mr. Dante McKay, who has served as the Director of DBHDD's Office of Children, Young Adults, and Families since February 2016. See McKay Decl.; [see also Docs. 439-1 at 4; 452 at 3]. The reasons DOJ proffers in support of its instant motion are: (1) the McKay

Declaration contains expert testimony and the State did not disclose Mr. McKay as an expert witness, (2) the McKay Declaration is not based on particularized personal knowledge (as is necessary for permissible lay opinions), and (3) no evidence supports the cost estimate for the potential expansion of Georgia's Apex program that Mr. McKay provides in his Declaration. [See Docs. 439-1 at 7–22; 474 at 1–2, 5]. In response, the State argues that (1) Mr. McKay is not an expert witness and his Declaration contains only properly-supported lay opinions; (2) the McKay Declaration's cost/workforce analysis was not performed before "the close of extended fact discovery" because the State did not "have any ability to predict what remedy" DOJ's experts would suggest until June 16, 2023 at the earliest; and (3) the State did not have a duty to supplement its discovery responses with the McKay Declaration because the State filed it the day after receiving it—on November 6, 2023—and the discovery requests the DOJ cites only asked for "existing" documents about the Apex program, not any newly-created analysis. [See Doc. 452 at 1–4].

Because the State disclaims that Mr. McKay is an expert witness, the Court does not consider him one and will not permit him to offer expert testimony. [Id. at 9]. Thus, the question before the Court is whether the McKay Declaration is a proper exhibit for summary judgment and can permissibly be introduced at trial as lay witness testimony. See FED. R. EVID. 701 (governing opinion testimony from lay witnesses). The State contends it is. However, regardless of whether the McKay

Declaration is admissible pursuant to Federal Rule of Evidence 701, the timing of its disclosure implicates Federal Rule of Civil Procedure 16. Rule 16(b) instructs that a district court must "enter a scheduling order that limits the time to . . . complete discovery[.]" See FED. R. CIV. P. 16(b)(3)(A). As the Eleventh Circuit holds,

> [s]uch orders "control the subsequent course of the action unless modified by a subsequent order," FED. R. CIV. P. 16(e), and may be modified only "upon a showing of good cause." FED. R. CIV. P. 16(b). This good cause standard precludes modification unless the schedule cannot "be met despite the diligence of the party seeking the extension." [See] FED. R. CIV. P. 16 advisory committee's note; see also Johnson v. Mammoth Recreations, Inc., 975 F.2d 604, 609 (9th Cir. 1992) ("If [a] party was not diligent, the [good cause] inquiry should end.").

Sosa v. Airprint Sys., Inc., 133 F.3d 1417, 1418 (11th Cir. 1998) (alterations in original). A district court's decision to enforce its pre-trial scheduling order will not be disturbed on appeal absent an abuse of discretion.[32] See id. (citing Santiago v. Lykes Bros. Steamship Co., 986 F.2d 423, 427 (11th Cir. 1993)).

The Court granted many requests for extensions of deadlines and modifications to the operative Scheduling Orders in this case, but the last extension of the fact discovery period was granted on February 1, 2023. [Doc. 344]. In the February 1, 2023 Amended Scheduling Order, the Court granted the Parties' joint

---

[32] Additionally, "district courts [have] broad discretion over the management of pre-trial activities, including discovery and scheduling." Johnson v. Bd. of Regents of Univ. of Ga., 263 F.3d 1234, 1269 (11th Cir. 2001); accord Chudasama v. Mazda Motor Corp., 123 F.3d 1353, 1366 (11th Cir. 1997) ("district courts enjoy broad discretion in deciding how best to manage the cases before them"); LR 26.2(B), NDGa.

93

request to extend fact discovery through March 10, 2023.[33]  [Id.]  The State first proffered the McKay Declaration as an attachment to its motion to exclude one of DOJ's experts, Dr. Robert Putnam, on November 7, 2023.  See McKay Decl.  This was seventeen (17) days after DOJ filed its motion for partial summary judgment and nearly eight (8) months after fact discovery closed.  [Doc. 395].  The State never requested that the Court re-open or extend fact discovery so that it could timely offer the McKay Declaration into the record.  Nor does the State make any effort in its response to DOJ's instant motion to address (much less satisfy) the Rule 16 good cause standard for modifying the March 10, 2023 fact discovery deadline set forth in the Court's February 1, 2023 Amended Scheduling Order.  [See generally Docs. 344, 452].  If the State wished to offer Mr. McKay as a rebuttal expert witness for purposes of responding to Dr. Putnam's expert report on the issue of reasonable accommodations, it should have done so.  Instead, the State seeks to introduce purported fact evidence nearly eight (8) months after the operative deadline.  Accordingly, given this extreme untimeliness, the Court grants DOJ's motion to exclude the McKay Declaration from the Court's consideration at summary judgment and trial.[34]  [Doc. 439].

---

[33] The Court granted the final extension of expert discovery by an Order dated October 17, 2023, which allowed the Parties through October 31, 2023 to complete all expert discovery.  [Doc. 394].
[34] In light of the Court's finding that the McKay Declaration is due to be excluded from summary judgment and trial due to its untimeliness, the Court need not address the alternative bases for this same relief set forth by DOJ in its instant motion.  [Doc. 439-1].

## V. Conclusion

For the foregoing reasons, the Court **GRANTS** DOJ's "Motion for Partial Summary Judgment" [Doc. 395] and **ENTERS JUDGMENT** in DOJ's favor solely on the question of whether the State administers the GNETS program such that it is subject to the Integration Mandate of Title II of the ADA.  The Court **GRANTS** DOJ's "Motion to Exclude the Declaration of Dante McKay" [Doc. 439], **DENIES** DOJ's "Motion in Limine to Partially Exclude Testimony of Dr. Andrew Wiley" [Doc. 476], and **DENIES** DOJ's "Motion for Leave to File Response to Defendant's Notice of Supplemental Authority."  [Doc. 493].

The Court **DENIES** the State's "Motion for Summary Judgment" [Doc. 429], **DENIES** the State's "Motion to Exclude Testimony of Dr. Robert Putnam" [Doc. 428], and **DENIES** the State's "Motion to Exclude Testimony of Dr. Amy McCart." [Doc. 431].

The Court **DIRECTS** the Clerk to **PROVISIONALLY SEAL** this order and to immediately transmit the electronic version of the docketed copy to all counsel of record.  The Court **DIRECTS** the Parties to, within fourteen (14) days of this order, file either (1) a joint motion to permanently redact specific portions of this order with a proposed redacted copy of this order attached or (2) a joint notice indicating their consent to this order being publicly docketed in fully unredacted form.  The

Court warns the Parties that their failure to timely comply with this directive will result in the public docketing of this order in fully unredacted form.

Next, the Court **ORDERS** the Parties to attend mediation within sixty (60) days of this order.  In the interim, the Court **DIRECTS** the Clerk to **ADMINISTRATIVELY CLOSE** this action so that it does not remain on the Court's active docket pending the Parties' forthcoming mediation.[35]  The Parties may mutually agree upon a private mediator within twenty-one (21) days of this order, and if they do, the Court **DIRECTS** them to file a notice so informing the Court (which should include the date of the scheduled mediation).  If the Parties are unable to agree on a private mediator within twenty-one (21) days of this order, the Court **DIRECTS** them to file a notice with the Court requesting referral to the next available Magistrate Judge for mediation (to occur within the overarching sixty (60)-day period following this order for the Parties to participate in mediation).

The Court **DIRECTS** the Parties to jointly file a notice on the docket informing the Court of the outcome of their mediation within seven (7) days of participating in the same.  If the Parties are unable to fully resolve this case during mediation, the Parties must file their proposed Local Rule 16.4 Consolidated Pretrial

---

[35] The Court notes that administrative closure will not prejudice the rights of either Party to this litigation.  A Party need only file a motion to reopen the case if it so chooses.

Order ("CPTO") within thirty (30) days of participating in mediation.  See LR 16.4, NDGa.  A table reflecting the deadlines set forth by this order appears below:

| Task | Deadline |
|---|---|
| Parties to file either (1) a joint motion to permanently redact specific portions of this order with a proposed redacted copy of this order attached or (2) a joint notice indicating their consent to this order being publicly docketed in fully unredacted form | Fourteen (14) days from this order |
| Parties to jointly file a notice apprising the Court of their agreement on a private mediator, or alternatively, a motion requesting that this case be referred to a Magistrate Judge for mediation | Twenty-one (21) days from this order |
| Parties to complete mediation (whether before a Magistrate Judge or private mediator) | Sixty (60) days from this order |
| Parties to jointly file a notice informing the Court of the outcome of their mediation | Seven (7) days from the completion of mediation |
| If mediation is unsuccessful, Parties to file their Local Rule 16.4 CPTO | Thirty (30) days from the completion of mediation |

Finally, the Court **DIRECTS** the Clerk to resubmit this matter to the undersigned after each of these deadlines expire.

**SO ORDERED**, this 16th day of August, 2024.

*Eleanor L. Ross*

Eleanor L. Ross
United States District Judge
Northern District of Georgia